HALLIE N. HATLEY, EXECUTRIX OF CARL ALEXANDRA HATLEY, DECEASED; AND HALLIE N. HATLEY, INDIVIDUALLY v. FRANK SHELTON JOHNSTON.

(Filed 23 July, 1965.)

1. **Insurance § 9.1—**

   The creditor has an insurable interest in the life of the debtor, and as between the creditor and an insured debtor, credit life insurance is collateral security. G.S. 58-195.2.

2. **Chattel Mortgages and Conditional Sales § 11.1; Principal and Surety § 10—**

   Where the chattel mortgagor sells the mortgaged chattel to a purchaser who assumes the mortgage debt and pays installments thereon with the assent of the mortgagee, the purchaser becomes liable on the debt as principal and the original mortgagor becomes a surety, and if the original mortgagor pays the debt he is subrogated to the rights of the mortgagee, even without an assignment.

**3. Same;    Subrogation—**

    Plaintiff's evidence tended to show that her testator owned a vehicle subject to a chattel mortgage protected by a policy of credit insurance on his life for which he paid the premiums, that testator sold the vehicle to a purchaser who assumed the debt, and that upon testator's death insured paid to the mortgagee the balance of the mortgage debt. *Held:* Plaintiff's evidence makes out a cause of action against defendant in subrogation to the rights of the mortgagee, since testator was a surety on the debt and payment by insurer amounted to involuntary payment through testator's insurance.

**4. Appeal and Error § 59—**

    A decision of the Supreme Court must be construed in the light of the facts of the case in which it is rendered.

APPEAL by plaintiff from a judgment of compulsory nonsuit entered at the close of her evidence by *McLaughlin, J.,* September 1964 of ROCKINGHAM.

*Gwyn & Gwyn by Julius J. Gwyn for plaintiff appellant.*
*Jordan, Wright, Henson & Nichols by Perry C. Henson for defendant appellee.*

PARKER, J.    Plaintiff's evidence and the allegations in her complaint admitted to be true in the answer show these facts: She is the widow of Carl Alexandra Hatley who died testate on 18 February 1963. She is sole devisee and legatee of her husband's estate under his will. She instituted this action as executrix of his estate and individually.

For some 30 years she and her husband owned and operated in Rockingham County a business under the name of Hatley Laundry and Dry Cleaning Company. Prior to 25 January 1963 they owned a number of trucks, and employed a number of route drivers to pick up articles to be laundered or dry cleaned, and then returned. Each driver was paid a 21% commission on his route for pickup and delivery.

On 7 February 1962 Carl Alexandra Hatley, hereafter referred to as C. A. Hatley, purchased from Johnson Chevrolet, Inc., a new 1962 model Chevrolet truck for a total time price of $2,887.60. The conditional sale contract, which he executed and delivered to Johnson Chevrolet, Inc., to secure the time payments for the purchase of this truck shows the following:

| | | |
|---|---|---|
| "Total Time Price (Sum of items 2 and 8) | | $2,887.60 |
| 1.  Cash Sale Delivered Price | | 2,500.00 |
| 2.  Total Down Payment Under Installment Sale | | 550.00 |
| 3.  Difference Between Items 1 and 2 | | 1,950.00 |

| | | |
|---|---|---|
| 4a. | Cost of Required Car Insurance | 102.00 |
| 4b. | Charge for Creditor Insurance on Life of Purchaser | 16.88 |
| 5. | Other Charges | $.............. |
| 6. | Principal Balance (Items 3, 4a, 4b, 4c and 5) | 2,068.88 |
| 7. | Finance Charge | 268.72 |
| 8. | Time (Deferred) Balance | 2,337.60 |
| | Payable * * * in 24 installments of each commencing March 24, 1962, and on the same day of each successive month thereafter." | 97.40 |

This conditional sale contract was assigned by Johnson Chevrolet, Inc., to General Motors Acceptance Corporation, hereafter called GMAC, and thereafter the installment payments, which were paid, were paid to that corporation.

The conditional sales contract on the back of the page contains Provision 9, reading in relevant part:

"If a charge for Creditor Insurance on the life of the purchaser is included in Item 4b on the face of this contract, the purchaser hereby specifically requests and authorizes the seller or assignee, in its or their own name, to procure from the Prudential Insurance Company of America insurance against the contingency of the purchaser's death occurring prior to the 15th day after the date herein provided for payment of the final instalment hereunder * * *. Such insurance shall be payable to the seller or assignee, or both, in an amount equal to the balance remaining to be paid hereunder on the happening of such contingency prior to termination of the insurance * * *. The time price payable under this contract includes a charge for said insurance."

Pursuant to the above-mentioned Provision 9 in the conditional sale contract, GMAC procured from the Prudential Insurance Company of America a certificate of insurance, which certifies that the life of C. A. Hatley, "debtor under a certain instalment obligation as dated above [2-7-62], has become insured under the provisions of Group Creditors Insurance Policy No. GL-360 issued by" itself. This certificate of insurance states that the life insurance charge was $16.88. It obligates Prudential immediately upon receipt of due proof in writing of C. A. Hatley's death prior to the termination of this insurance on his life to pay to GMAC the amount equal to the balance remaining to be paid under the installment obligation and unpaid.

A certificate of title to this Chevrolet truck was issued to Hatley Laundry and Dry Cleaning Company by the Commissioner of Motor Vehicles, which showed GMAC as a lienholder.

Prior to 1 February 1963 C. A. Hatley decided to sell all the trucks owned by his wife and himself and used in the operation of their laundry and dry cleaning business to their route drivers, and in consideration of their operating their own trucks to pay them a 40% commission for pickup and delivery, instead of the 21% they were paying when they furnished the trucks.

Defendant Johnston had been working for them for 16 or 17 years, and was operating as a route driver the 1962 Chevrolet truck which C. A. Hatley had purchased from Johnson Chevrolet, Inc., as above set forth. The Hatleys had made installment payments to GMAC on this truck, but had not paid the installment payments due in December 1962 and in January 1963, and on 1 February 1963 the installment payments unpaid on this truck under the conditional sale contract amounted to $1,363.60. The value of this truck at that time was $1700 or $1800. About 1 February 1963 C. A. Hatley and defendant Johnston entered into a contract providing that Hatley sell to him this Chevrolet truck, and that Johnston should pay him for it $400 and assume and pay the monthly installments on it as set forth in the conditional sale contract. Defendant Johnston paid C. A. Hatley $400 on the purchase price of this truck. On 1 February 1963 C. A. Hatley gave defendant Johnston a written power of attorney to apply for a certificate of title to this Chevrolet truck.

Before defendant Johnston paid GMAC any installment payment, C. A. Hatley died on 18 February 1963. On 4 March 1963 Prudential Insurance Company, as it was obligated to do by the provisions of its certificate of insurance issued to GMAC on the life of C. A. Hatley, paid to GMAC the sum of $1,363.60, which represented the amount of unpaid installments at the time of C. A. Hatley's death on the time price of the Chevrolet truck under the conditional sale contract. Van York, an employee of GMAC in Greensboro, testified: "There was a rebate due as a consequence of the prepayment of the deferred installments when the $1,363.60 was paid from the insurance. A rebate of $62.84 was rebated to the estate of Carl Alexandra Hatley. * * * When we received that money, we pulled this certificate of title and marked the lien paid in full."

On 5 March 1963 defendant Johnston applied to the Department of Motor Vehicles for a new certificate of title to himself as purchaser of this Chevrolet truck, in which he stated that he had acquired this Chevrolet truck from Hatley Laundry and Dry Cleaning Company, and that he placed this vehicle in operation in North Carolina on 1

February 1963, and there was no lien on it. This was sworn to and subscribed by him before a notary public on 5 March 1963. As a part of his application for a new certificate of title to himself, defendant attached to it an assignment of title by registered owner sworn to and subscribed by him on 5 March 1963 before a notary public reading as follows:

"ASSIGNMENT OF TITLE BY REGISTERED OWNER

"For value received, the undersigned hereby sells, assigns or transfers the vehicle described on the reverse side of this certificate unto the purchaser whose name appears in this block and hereby warrants the title to said vehicle and certifies that at the time of delivery the same is subject to the lines [*sic*] or encumbrances named in Section D, the purchaser's application for new certificate of title and none other.

"Purchaser's name and address:
Frank Shelton Johnston
429 High Street
Draper, North Carolina
"Date of sale: Feb. 1, 1963
"Seller's name and address:
Hatley Laundry and Dry Cleaning Co.
By Carl Alexandra Hatley
By Power of Attorney by:
s/ Frank Shelton Johnston
     (PA attached)"

The certificate of title to this Chevrolet truck issued to Hatley Laundry and Dry Cleaning Company submitted by defendant as part of his application for a transfer of title to this Chevrolet truck to himself shows the following:

"FIRST LIEN:
Amount, $2338.56; Kind, Conditional Sale
Contract, Date 2-6-62; Lienholder, GMAC,
Greensboro, N. C.
     RELEASE OF FIRST LEASE [*sic*]
     Date of Release:  3-4-63
     Lienholder: GMAC
     By: s/ C. G. Heath, Authorized
                              Representative"

Over defendant's objection plaintiff offered in evidence a written agreement entered into on 28 February 1963 by and between Hallie N. Hatley and defendant by the terms of which Hallie N. Hatley sold this Chevrolet truck to defendant for the sum of $400, and defendant agreed to operate it as a route driver to pick up and deliver articles for Hatley Laundry and Dry Cleaning Company, which she continued to operate after her husband's death, and if he decided to stop such work that he would sell this truck back to her at the wholesale price shown for it by the Blue Book. This agreement contains this language: "This sale is subject to lien in favor of GMAC on this truck." This agreement was signed Hatley Laundry and Dry Cleaning Company by Hallie N. Hatley, owner, and by defendant, and witnessed by D. Floyd Osborne. Plaintiff testified: "In other words, the contract which I signed with the routemen, including Mr. Johnston, on or about February 28, 1963, was the contract that my husband had worked out with all of these drivers prior to his death." The trucks sold by C. A. Hatley to the other drivers were old, and had no liens on them.

At the time of the trial defendant was operating this Chevrolet truck as a route driver picking up and delivering articles for Hatley Laundry and Dry Cleaning Company. After her husband's death, plaintiff asked defendant to pay her the balance of the installments that were due on this Chevrolet truck at the time her husband died. All defendant would say was, "it was his truck." All defendant has paid for this Chevrolet truck is $400.

From our considerable investigation of the authorities over the United States, the nearest case we have found presenting a factual situation similar to the factual situation in the instant case is *Kincaid v. Alderson*, 209 Tenn. 597, 354 S.W. 2d 775 (1962). The facts in the *Kincaid* case, as set forth in the opinion, are: In 1958 Clayton L. Alderson and his wife, Barbara M. Alderson, purchased a mobile home in Wichita Falls, Texas. At the time of this purchase they executed a chattel mortgage on this mobile home to Commercial Credit Corporation to secure a note, payable to said corporation, in the sum of $6,-439.20, which was payable in monthly installments of $107.32 over a period of five years. The amount of these payments included premiums on a life insurance policy issued to Commercial Credit Corporation on the life of Clayton L. Alderson, the maker of the note. This life insurance was payable to the credit corporation in the event Clayton L. Alderson died prior to the payment date of his note. In January 1960 the Kincaids purchased this mobile home from Alderson for $600 in cash and assumed the payment of the balance due to the Commercial Credit Corporation on the note executed by Alderson to secure the purchase money chattel mortgage on this mobile home. At the time of

the purchase by the Kincaids the balance due on said note was $4,-892.80. In September 1960 Clayton L. Alderson was killed in Germany. In due course the insurance company paid the balance due on said note to Commercial Credit Corporation. The Kincaids instituted an action against Barbara M. Alderson, the surviving mortagor, and Commercial Credit Corporation to quiet title to this mobile home and to compel execution of clear title of it to them. The Kincaids' bill was demurred to by defendants on various grounds. The Chancellor sustained the second ground of the demurrer which was that the Kincaids had not paid the $4,892.80, which was the balance due to the credit corporation on the note executed by Alderson to secure the purchase money chattel mortgage on this mobile home, as they had contracted to do. The Supreme Court affirmed the order of the Chancellor, holding that a chattel mortgagor, on whose husband's life policy of insurance was taken and paid for by him in mortgagee's favor and who sold chattel to plaintiffs under title bond obliging plaintiffs to assume payments, was not required to execute clear title to plaintiffs upon husband's death and consequent payment of insurance to mortgagee, but had a right of action against plaintiff as a surety who had discharged his principal's debt. The rationale of the *Kincaid* decision is as follows: The contract between the Aldersons and the Kincaids is nothing more than an old-fashioned title bond. Such a bond gives the Kincaids an equitable title converted into a legal title, upon the payment of the consideration. Commercial Credit Corporation had an insurable interest in the life of its debtor, Clayton L. Alderson, so as to entitle it to the proceeds of such insurance to the amount of its debt, including interest, citing in support of such principle Appleman on Insurance Law and Practice, Vol. 2, § 762, p. 88, and Couch on Insurance, Vol. 3, § 24:154, p. 266. The Court in its opinion said:

> "When the Kincaids assumed the mortgage indebtedness of the Aldersons on this mobile home they, that is the Kincaids, became primarily liable to the mortgagee, owner of the debt, and the Aldersons then occupied the legal status of a surety. *Fulmer v. Goldfarb,* 171 Tenn. 218, 101 S.W. 2d 1108; *Title Guaranty & Trust Co. v. Bushnell,* 143 Tenn. 681, 228 S.W. 699, 12 A.L.R. 1512; *Merrimon v. Parkey,* 136 Tenn. 645, 191 S.W. 327, and many others. This proposition is annotated in 21 A.L.R. 439, wherein it is shown that most of the jurisdictions in the United States, including Tennessee [also North Carolina], have adopted this proposition. In other words the Kincaids now become personally liable for the debt.

"When the Kincaids assumed payment of this debt they became the principal debtor and the Aldersons became the surety for the debt. *Stone's River National Bank v. Walter*, 104 Tenn. 11, 55 S.W. 301; *Sully v. Childress*, 106 Tenn. 109, 60 S.W. 499, and many others. By these undertakings the successive grantees form a chain of liabilities for the payment of the mortgage debt, the last grantee being the principal debtor and the others surety. See likewise *Wright v. Bank of Chattanooga*, 166 Tenn. 4, 57 S.W. 2d 800. An annotation on this subject is in 21 A.L.R., page 504, wherein cases from many jurisdictions are cited to support the proposition. Thus it is that the Aldersons after this obligation had been assumed by the Kincaids are merely sureties and Kincaid is the principal debtor. In other words the Commercial Credit Corporation would have had an insurable interest in the Kincaids as well as the Aldersons because they both, the Kincaids primarily and the Aldersons now secondarily, were liable for this obligation.

"When thus a surety by his death through a valid life insurance policy on his life has discharged the obligation, this does not discharge the obligation of the Kincaids who are primarily liable. It would be exactly the same situation as if a surety on an obligation for any reason decided to pay off the obligation. This would not release the principal debtor from his obligation, but it would then be transferred to the surety who had discharged the obligation to release himself as surety. Thus by the death of Alderson and his life insurance paying this debt it would merely transfer the debt of the principal obligator to the surety rather than to the creditor. When the debt is thus paid the surety subrogated to the rights of the creditor. *Willis v. Davis*, 3 Minn. 1. This payment constitutes 'an unjust enrichment of the principal' who must 're-imburse the surety to the extent of the enrichment.' Restatement of the Law, Security, § 104. Comment on Subsection (2), page 279. The contract herein, quoted from extensively, makes no provision to the contrary but by the plain wording of this contract the Aldersons or their heirs agree when this obligation is discharged, or put in a position where it can be refinanced, then they will convey good title. There is nothing in this contract which would indicate that if Alderson dies and the debt is paid through this insurance that it would relieve the principal obligator.

\*      \*      \*

"Argument is likewise made herein in behalf of the Kincaids that by this contract, assuming and agreeing to pay for this, that

it amounted to an assignment of the Aldersons to the Kincaids of this life insurance on Alderson's life. This is an incorrect assumption because the Aldersons had nothing to assign. The life insurance was written for the benefit of the Commercial Credit Corporation. They were the beneficiaries of the insurance on Alderson, and Alderson had nothing to assign and by any contract that he made he couldn't make such an assignment."

The writer of the opinion stated in effect that due to his interest in the questions presented he spent several days in an independent investigation before arriving at a conclusion, and that "from our investigation of the authorities over the United States the nearest case, and the only one anywhere near the factual situation herein that can be found, is that of *Moneymaker v. Calloway, supra* [9 Tenn. App. 348]." In our opinion, the result reached in the Kincaid case is sound law.

Another case we have found in our investigation with a quite similar factual situation to the factual situation in the instant case is *Betts v. Brown,* 219 Ga. 782, 136 S.E. 2d 365, *reh.. den.* 2 April 1964. This is a summary statement of the facts in the *Betts* case, as set forth in the opinion: Decedent L. Porter Betts conveyed land mortgaged to a bank to Brown, who assumed payment of the mortgage debt. Brown went into possession of the land, and so remains. Brown defaulted in the mortgage payments. Decedent Betts and Brown then executed a note to the bank in renewal of decedent's original note to the bank. At the same time, the bank procured two credit life insurance policies on decedent Betts' life for the amount of the debt. Brown then defaulted on the renewal note, and decedent Betts died while payments on the mortgage were still in default. After collecting on the insurance and after applying the proceeds from the insurance policies to the payment of its debt, which was sufficient to satisfy it, the bank filed an interpleader in the action of *Betts v. Brown* in the trial court to determine how it should dispose of the mortgage note and deed. It was not alleged who paid or agreed to pay the premiums on these policies. Brown claimed his obligation on the debt was cancelled by the payment of the insurance by the insurer. Decedent's widow, to whom the entire estate of her deceased husband had been set aside to her as her year's support, claimed payment by the insurer was payment by the insured decedent, and thus his estate was entitled to subrogation against the primary debtor, Brown. The trial court entered judgment holding payment under the credit life insurance policy cancelled Brown's obligation on the note. The Supreme Court of Georgia reversed the trial court's judgment sustaining Brown's demurrer and dismissing plaintiff's claim, and held that claim of the widow of deceased grantor whose death resulted

in the involuntary payment of a debt to the bank by the insured with the proceeds of a credit life insurance policy resulted in subrogation by the insured's estate against the assuming grantee, and stated a cause of action to have money judgment against grantee who had agreed to assume the indebtedness. The Court in its opinion said: "Insofar as we have found, the instant case is one of first impression." In the *Betts* case the Court reasoned that the primary debtor, as a stranger to the credit life insurance contract, could claim none of its benefits. To determine what constitutes payment of the debt by the insured surety in credit life insurance situations, the Court relied upon the Georgia Insurance Code, in concluding that payment by the insurer is payment by the insured surety. In our opinion, the result reached in the *Betts* case is sound. The Court in conclusion said:

> "This brings about an equitable result, in keeping with the purpose and principles of subrogation. What Betts and Brown originally agreed upon takes place. Brown has his portion of the land in return for paying the balance of the agreed consideration, the indebtedness which he assumed. Betts (as succeeded by Mrs. Betts) receives what he bargained for, in that the debt on the entire tract of land, the portion he retained and the portion he conveyed to Brown, is paid by Brown. There is no unjust enrichment of Mrs. Betts because she receives money in addition to the debt being paid. If Brown had paid the indebtedness as he promised to do, the bank could not have declared the entire amount due and applied the insurance proceeds to pay it."

The opinion in the *Betts* case neither refers to nor cites the Tennessee case of *Kincaid v. Alderson, supra.*

G.S. 58-195.2 states: "Credit life insurance is declared to be insurance upon the life of a debtor who may be indebted to any person, firm, or corporation extending credit to said debtor." This statute was enacted in 1953. As a creditor of C. A. Hatley, GMAC had an insurable interest in his life. *Miller v. Potter*, 210 N.C. 268, 186 S.E. 350. When, according to plaintiff's evidence, her husband sold the Chevrolet truck to defendant, and defendant assumed the payment of the unpaid installment payments on it to GMAC, defendant became liable as principal on this indebtedness to GMAC, and her husband became liable as surety. GMAC could have sued defendant on his contract as assumption. *Miller v. Potter, supra; Rector v. Lyda*, 180 N.C. 577, 105 S.E. 170, 21 A.L.R. 411; 83 C.J.S., Subrogation, § 37.

In 2 Jones on Mortgages, 8th Ed., § 1125, it is said: "An indorser of a note or surety of a debt, upon being compelled to pay it, is entitled to the benefit of any security, as, for instance, a mortgage given by

the principal debtor to the holder of the note, or debt to secure it. Without any assignment of it, he is by force of law subrogated to the benefit of it." Citing in support many cases from many jurisdictions, including our case of *Knight v. Rountree,* 99 N.C. 389, 6 S.E. 762. See *Boney, Insurance Comr. v. Insurance Co.,* 213 N.C. 563, 197 S.E. 122, for a discussion of the doctrine of subrogation.

In 50 Am. Jur., Subrogation, § 101, it is stated: "A mortgagor who, after a transfer of the property or security, pays the debt secured by the mortgage is entitled to be subrogated to the rights of the mortgagee under the mortgage, where the amount due under the mortgage is taken into consideration and deducted from the purchase price, or where the purchase is simply of the equity of redemption."

In 83 C.J.S., Subrogation, § 37, it is said:

"Where a grantor, mortgagor, or chattel mortgagor conveys the mortgaged property, and his grantee assumes payment of the mortgage, as between such parties the former becomes a surety and the latter the principal debtor, and, in accordance with the general rule, discussed infra § 47, that a surety who pays the debt of the principal is subrogated to the rights and remedies of the creditor, where the grantor or mortgagor or a chattel mortgagor pays the debts secured, he is entitled to subrogation thereto, and to all of the rights of the mortgagee, and may foreclose the mortgage for his own benefit, sue to recover the land, or sue the vendee in an action at law for money paid."

In *ibid,* § 47, it is said:

"A surety, by payment of the debt of his principal at a time when he is obliged to make payment, acquires an immediate right to be subrogated, to the extent necessary to obtain reimbursement or contribution, to all rights, remedies, and securities which were available to the creditor to obtain payment from the person or property of any person who, as to the surety is primarily liable for the debt, or of a cosurety who is bound to contribute."

Credit life insurance, as between the creditor and insured debtor, is collateral security. Consequently, payment of the debt with credit life insurance, when the insured authorizes the creditor to procure the policy and pays the premium himself, is payment by the insured debtor, just as payment with any collateral security is payment by the owner thereof. The presence of an assuming grantee, who has no right to change the beneficiary under the policy, and therefore no claim of ownership, should not alter that result. 45 Texas Law Review (March 1965), p. 580, "Credit Life Insurance — Payment of Mortgage In-

debtedness with Proceeds of Credit Life Insurance Inured to Insured Mortgagor's Widow in Her Claim for Subrogation Against Assuming Grantee. *Betts v. Brown,* 219 Ga. 782, 136 S.E. 2d 365 (1964)."

Considering plaintiff's evidence in the light most favorable to her, it seems clear that the payment by the insurer of $1,363.60 under credit life insurance on the life of C. A. Hatley, the premium on which had been paid by him, and which represented the amount of unpaid installments on the Chevrolet truck at the time of C. A. Hatley's death on the time price of the Chevrolet truck under the conditional sale contract, was an involuntary payment, and should entitle insured's estate to subrogation against the assuming grantee. If such payment by the insurer were allowed to cancel the primary defendant debtor's obligation, under the assumption agreement entered into by him, the defendant, the primary debtor, would in effect be made a beneficiary although he has no insurable interest in the life of the insured. On the other hand, if the creditor, GMAC, were given an absolute right to the proceeds of the policy, independent of the debt involved, the public policy limiting it to indemnification would be contravened, 45 Texas Law Review, p. 580. In our opinion, and we so hold, plaintiff's evidence makes out a case against defendant entitling her husband's estate to subrogation against him, the assuming grantee, and primarily liable for the payment of the unpaid installments on the Chevrolet Truck at the time of C. A. Hatley's death, to obtain payment from him of the amount paid by Prudential to GMAC in full payment of such unpaid installment payments on the Chevrolet truck under the obligatory terms of a credit life insurance policy on C. A. Hatley's life, the premium on which was paid by C. A. Hatley, sufficient to survive the challenge of a motion for a judgment of compulsory nonsuit.

Defendant relies upon *Miller v. Potter, supra,* which was decided by a divided Court, three to two. This case is factually distinguishable from the instant case. In that case the facts as stated in the opinion, so far as relevant here, are as follows: On 15 October 1928 Home Mortgage Company loaned $3,000 to Nash and wife, secured by a deed of trust on a house and lot. On 17 May 1929 Nash and wife conveyed the house and lot to Miller, who, as part of the purchase price, "assumed and agreed to pay" the deed of trust. On 11 June 1929, to better secure the loan Home Mortgage Company, under the provisions of the deed of trust, took out a 12-year term reducing policy of insurance on Miller's life in the sum of $3,000, had itself made the beneficiary in the policy, and paid the premiums thereon. On 8 September 1930 Miller and wife conveyed the house and lot to Hatcher, who also assumed the payment of the debt as Miller had done. On 19 September 1930 Hatcher conveyed the house and lot to Potter and wife, who also assumed the

payment of the debt just as Miller and Hatcher had done. On 11 March 1933 Miller died. In December 1933 Home Mortgage Company collected insurance in the amount of $2,475.39, marked the deed of trust paid, and mailed it to Potter, who had it cancelled of record. Miller's widow, as administratrix of her deceased husband's estate, and his only child brought this action, *inter alia*, for subrogation to the rights of the creditor Home Mortgage Company to that part of the insurance proceeds used in paying the indebtedness and to have the cancellation of the deed of trust stricken out, to the end that Miller's estate should hold the deed of trust as a valid lien against the house and lot. The majority opinion states in part:

> "However, while the debt of Miller's estate was paid, neither Miller nor his estate paid it, and since neither paid the debt, the estate is not entitled to subrogation. * * * True, if Miller or his estate had been compelled to pay the debt he or his representative would have been subrogated to the rights of the creditor, the Home Mortgage Company."

The majority opinion held that Miller's estate was not entitled to be subrogated to the rights of Home Mortgage Company as against the later transferees of the equity, since neither Miller nor his estate paid the mortgage debt.

Defendant in a memorandum of additional authority relies upon the following statement in *Insurance Co. v. Assurance Co.*, 259 N.C. 485, 131 S.E. 2d 36:

> "Where, however, the insurance is procured by the mortgagee pursuant to the authorization and at the expense of the mortgagor, no right of subrogation exists and the amount paid by the insurer must be applied to discharge or reduce mortgagor's obligation to mortgagee."

"The law discussed in any opinion is set within the framework of the facts of that particular case * * *. 'It is platitude to say that language wrenched from its context is apt to be misconstrued. Courts repeatedly have held that the language of their opinions must be read in connection with the facts of the case in which the language was used.' * * * Walter, Brief-Writing and Advocacy, pp. 78-9." *Light Co. v. Moss*, 220 N.C. 200, 17 S.E. 2d 10.

In *Insurance Co. v. Assurance Co., supra*, the question presented on appeal for decision was: Should each of two insurance companies contribute to the payment of the loss in the proportion which the sum insured bears to the total insurance, or must plaintiff insurance company pay all the loss? The factual situation in that case was utterly

different from the factual situation here. The statement in that case relied on by defendant states correctly the law as applied to the facts of that case, but it is not authority supporting defendant's contention that on the particular facts of the instant case Hatley's estate here is not entitled to subrogation against defendant.

The judgment of compulsory nonsuit below is

Reversed.