HEINRICH, Respondent, v. MAGEE, et al, Defendants, ZIMMERMAN, Appellant.

(217 N. W. 631.)

(File No. 5896. Opinion filed February 4, 1928.)

*Chamberlain & Hall* and *Gardner & Churchill,* all of Huron, for Appellant.

*Null & Royhl,* of Huron, and *E. M. Morsman, Jr.,* of Omaha, Neb., for Respondent.

MISER, C. On April 13, 1914, a permit was issued to the defendants Magee and Zimmerman to graze 50,000 sheep or 10,000 cattle on district No. 3 in the Crow Reservation in Montana from April 1, 1914, to January 1, 1916. The permittees agreed to pay therefor $45,000, in four installments of $11,250 each, the first installment being cash, the remaining installments on October 1, 1914, April 1, 1915, and October 1, 1915. To secure the payment of these fees, plaintiff Heinrich and one Spear, as sureties, went on the bond of the permittees. The government brought suit in federal court against the permittees and their sureties in August, 1916, for the sum of $5,625, being half of the October, 1915, installment. Zimmerman was not served with process therein and made no appearance. In January, 1920, attorneys for defendants Magee, Heinrich, and Spear admitted service of an amended complaint, asking judgment for $16,875, being half of the April and all of the October, 1915, installment, and thereafter judgment was taken by the government against them for that sum, with interest. This judgment was satisfied by Heinrich by his payment, on February 11, 1921, of the sum of $24,777.12. Thereafter this suit was instituted in the circuit court of Beadle county by Heinrich to compel Magee and Zimmerman to reimburse him for the sum so paid; but in this suit Magee was not served with process. Upon a verdict of the jury, judgment was entered on June 14, 1924, against Zimmerman for $30,144.08.

Hereafter Zimmerman will be referred to as Z., Heinrich as H., and Magee as M.

In this suit, defendant Z. claims that, soon after the execution of the grazing contract, he transferred his rights therein to M., his co-defendant; that H., surety, had full knowledge of the same and consented thereto; that thereafter H., surety, with M., enjoyed all the benefits of the contract; and that, therefore, it was H.'s duty to discharge all the obligations thereunder; and H., surety, having full knowledge of Z.'s release and consenting thereto and having exercised the privilege of grazing under said contract, is estopped to claim Z. liable under said grazing contract and bond. As a further defense, Z. alleged that, at the time of said assignment, H. agreed with M. that he would pay all leasing fees for the privilege of using the lease during the entire term, and that, in pursuance of that agreement, he placed a large number

of cattle on the land and kept them there during the entire term of the lease and made said payments on the lease. Z. also set up a counterclaim to prove which evidence was introduced at the trial; but no exception was taken to the refusal of the court to submit the counterclaim to the jury.

■ The assignments of error fall in three classes: Those relating to admission of evidence; to errors in instructions; to sufficiency of evidence. We believe that there was sufficient evidence properly admissible to justify the verdict if believed by the jury. To pass upon the assignments relating to the admission of evidence and the instruction of the jury requires a review of the testimony.

Both permittees and bondsmen were large owners of live stock, which, at various times, they had ranged on the Crow Reservation. Spear and Zimmerman had been partners; Heinrich and Magee were friendly and socially intimate. On April 13, 1914, Z. and M. obtained the lease to district No. 3. On April 15th, M., who was trying to finance himself to stock it, showed H. the lease and talked with him about it. On April 22d, H. wrote from Montana to M., pointing out numerous disadvantageous provisions in the lease as follows: That it would be impossible to get stocked up until August or September; that it would cost at least $25,000 to put in the equipment to handle cattle on that range; that, while the contract called for 400,000 acres, there was actually only about 300,000 acres in No. 3; that, inasmuch as the lease expired on January 1, 1916, he would have to get his cattle off before that time; and that he would be paying at the rate of $30,000 per year; suggesting that these matters be put up to the government, and, if M. could get a new contract such as outlined, with the understanding that he (H.) could use it for his cattle, he would pay $25,000 for the use of the range, "between the Big Horn river and lease No. 4 and south of the township line north of Beauvais creek," about half of the acreage, providing H. could graze an average of 6,000 cattle per annum until January 1, 1916; saying also that he would range free of charge for M. any cattle in excess of the average of 6,000 up to 8,000; making numerous other suggestions as to Indian claims, fences, etc. On May 10, 1914, Z., apparently in response to a wire from M., wired from San Antonio, Tex., to M. that he could not accept $12,000 for land south of Beauvais

creek. On May 11, 1914, M. offered $12,500 for that acreage. On May 19th, Z. wired M. inquiring what he could get for the entire lease, stating that he could use enough of it to graze 15,000 sheep that summer. On the same day, M. wired Z. that he would cancel the entire lease unless he could get immediate action. On May 21st,. M. wrote H.:

. "I have not written you for the last week as I had nothing definite to offer. I have been unable to get anything satisfactory out of Zimmerman, but will wire you full particulars by Monday or Tuesday at the latest. It has certainly been fierce trying to deal with this man Zimmerman; and I will cut loose from him at any cost."

On June 4th, Z. arrived on the range 40 miles from the lease with 16,000 head of sheep, where he was met by M. Prior to that time, according to the testimony of M., H. had told M. that, if he (M.) could get Z. off, he (H.) would make it greatly to M.'s advantage, and would go so far as to pay all the leasing fees on the range, and that M. could have all the sheep and grass that he could possibly get money enough to handle. About June 4, 1914, between the unloading point and the lease, M. purchased from Z. the 16,000 sheep and the equipment which he had brought there, and repaid him for that half of the first installment on the lease which Z. had paid. M. testified that H. was informed as to that transaction, and that H. prompted all his dealing with Z. in regard to buying Z.'s sheep and interest in the range. Z. testified that, when M. bought his sheep, the following conversation was had between M. and himself:

"I said, 'Can you stock this range if you buy it?' 'Well,' he said, 'I am going to be interested with another party * * * and I am buying it for him and myself.' I said, 'If you are taking this range off my hands, you would have to be able to stock it and take care of it. Who is the other party?' He said, 'You know.' I said, 'Is it Frank Heinrich?' He said, 'Yes; * * * Frank Heinrich is taking an interest with me in it, and we are going to stock it together.' I said, * * * 'Now, then, in that case, I would want to transfer the lease and get clean out of it.' He said, 'No; you can't do that; you daren't transfer the lease, because Frank Heinrich is badly in with the reservation—with the government;' and he said he would have to carry this lease and he would just have to let

Heinrich run his stock on there, and he would carry the lease. It couldn't be transferred. * * * I said there was a mortgage against the sheep; I had made a loan of $50,000. He said, well, we would let that stand and when it matures in the fall he would pay it and he would pay me the difference in money and pay me, give me a check * * * which was some over $5,000, and he said he would buy this. I said, 'Now, if you buy this, why this takes lots of money to handle this lease.' He said, 'Well, you know Frank Heinrich—he has got the money and he can handle it.' I says, 'All right; I will sell it to you and him then;' sell it to him for them."

Thereafter, in a financial statement to his bank at Omaha, M. stated that Heinrich had agreed to sublet district 3 from him and accept all liability therefor, and, in consideration thereof, Heinrich had agreed to run for him 3,000 head of cattle, stating to the bank that he wanted $50,000 at that time and reasonable assurance that he could have a like amount on November 15, 1914, to take up the note of Zimmerman.

It is undisputed that Z. did not, during the term of this lease, put any stock whatever upon district 3; that, both in 1914 and 1915, M. had sheep on the lease but no cattle; that, both in 1914 and 1915, H. had a large number of cattle on the lease. According to affidavit filed with the superintendent of the reservation, signed by H. on July 21, 1915, he had then 7,875 cattle thereon, of which 6,275 at least had been placed there during the previous year, beginning in September, and on district 4, between which and district 3 there was no fence, 9,008 cattle, a substantial number of which were placed there in 1914. H. does not deny having received the letters which M. testified he wrote him in May and June, 1914, although H. contradicts much of M.'s oral testimony, as well as statements made by M. in his financial statement. As to what, if any, arrangement there was between H. and M. at the time when Z. sold his sheep to M. and his interest in the lease—according to Z.'s testimony—to M. and H., H. does not testify. H.'s testimony is that he finally entered into an arrangement with M. the latter part of August or the fore part of September, 1914, that H. was "to pay half his range fee—his and Z.'s range fee—and was to have the use of half the range."

On June 29, 1914, H. justified as surety on the bond which is

the basis of this suit. This was over a month—unless M. not only testified falsely but manufactured a letter to corroborate his perjury—after M. had written to H. that he intended to cut loose from Z. at any cost, 25 days after M. paid Z. for his sheep and after Z. had sold his interest in the lease to M. for M. and H., three weeks after M. wrote H. reminding him that he had not heard from him since leaving word in regard to getting rid of Z. Every syllable of the testimony of H. as to the arrangement which was finally made between M. and himself in September, 1914, might be true, without it necessarily being untrue that, in June, 1914, before H. justified as bondsman, H. knew that Z. had sold his interest in the lease to M. for M. and H.; that Z neither had any interest whatever in the lease nor live stock in the district; and that, whatever the facts might be as to whether M. actually did represent H., Z. dealt with M. in the belief that M. was dealing with him as the agent of H., and that, as M. testifies, H. prompted all his dealings with Z. It is true that the oral testimony of M. is contradicted by his writings, his writings contradict each other, and he received from H. and kept $5,625, which it was his duty to remit to the government whether he and H. were joint owners of the grazing privileges or whether he had sublet the lease to H.

In this case, Z. appears in the bond as principal and H. as surety. If that relationship was not changed, then, when H. paid the debt, Z. was bound to reimburse him, under section 1508, Rev. Code 1919, which is a statutory declaration of the general rule on liability. The question presented to the jury by the evidence and by the pleadings was, however, whether, as between Z. and H., that relationship was changed, whether, after June 4, 1914, as between himself and Z., H. remained as surety for Z.'s debt, or whether H. became the principal and Z. became H.'s surety. This appeal raises the question as to whether the instructions to the jury fairly presented that issue.

"Where a surety, for valuable consideration, agrees with the principal to pay the indebtedness, he thereby becomes the principal; and the principal becomes his surety." 1 Brandt on Suretyship (3d Ed.) § 49, p. 120; Chaplin v. Baker, 124 Ind. 385, 24 N. E. 233; 32 Cyc. 38; 21 R. C. L. 954; Smith v. Shelden, 35 Mich. 42, 24 Am. Rep. 529.

It is immaterial in what form the relation of principal and surety is established, or whether the creditor was or was not contracted with in that relation. The relation is vested by the arrangement and equities between the debtors, and may or may not be known to the creditor. Porter v. Waltz, 108 Ind. 40, 8 N. E. 705.

"One who has received, and who retains, the consideration or benefit of a contract cannot, in equity, occupy the attitude of a surety." Johnson v. Jouchert, 124 Ind. 105, 108, 24 N. E. 580, 581 (8 L. R. A. 795); Brandt on Suretyship, supra, § 1.

"The relation of suretyship is fixed by the arrangement and equities between the debtors, and is determined by inquiring who received the consideration of the contract, or who, according to the arrangements between the parties, ought to pay the debt." Lackey v. Boruff, 152 Ind. 371, 53 N. E. 412; 1 Brandt on Suretyship, § 292, p. 569; Dean & Co. v. Collins, 15 N. D. 535, 108 N. W. 242, 9 L. R. A. (N. S.) 49, 125 Am. St. Rep. 610, 11 Ann. Cas. 1027.

"The respective liabilities of principal and surety may be reversed, so that the principal becomes the surety and the surety the principal." 32 Cyc. 37; Williams v. Coleman, 70 Cal. App. 400, 233 P. 397; Josephian v. Lion, 66 Cal. App. 650, 227 P. 209.

■ At the conclusion of the evidence, appellant requested an instruction, which, after reciting the facts as appeared from the undisputed evidence, continued:

"It also appears that the defendant Zimmerman, some time in the month of June, 1914, had certain negotiations with the said Jerome P. Magee with reference to disposing of his interest in said permit or lease. It is the claim of the defendant that, while his negotiations and transactions for the sale of his interest in said lease or permit were had with the said Jerome P. Magee, such transactions and negotiations were with the full knowledge and consent of the plaintiff herein, were at his instigation, and that the purchase of said interest, though taken in the name of Magee, was, in fact, for and in the interest of the plaintiff, and that the plaintiff succeeded to the defendant's rights under the said lease or permit and took his place therein and took over and used the said ranch and the defendant claims that by so doing the said plaintiff became the principal and therefore became and was pri-

marily liable for the payment of the lease fees and that the defendant was under no obligations, so far as the plaintiff in this action is concerned, to pay the same.

"The evidence is all before you, and it is for you to determine what the facts are. If you believe from the evidence that the sale of the defendant's interest in the said lease or permit made by the defendant D. B. Zimmerman was with the knowledge of the plaintiff and in his interest and behalf, even though in the name of Jerome P. Magee, then you are instructed, as a matter of law, that the plaintiff would become the principal and primarily liable, and your verdict should for the defendant on the first cause of action stated in the complaint."

This instruction was refused and duly excepted to, and the court, of its own motion, gave the following instruction No. 3, to the giving of which instruction the appellant duly accepted:

"Under the law in all agreements or contracts there must be consent of the parties, and this consent must be free, mutual, and communicated by each to the other. In this case in order for the plaintiff and the other parties to change their legal relations under the lease and bond, there must have been an agreement between them, and Zimmerman and Magee could not change their legal relations as to Heinrich without an agreement with Heinrich to such change as affected him, and such an agreement must be shown by the evidence. All the evidence in the case is before you and it is for you to determine from all the evidence whether or not such an agreement was made between the parties as is claimed by the defendant Zimmerman."

Appellant excepted to instruction No. 3 on the ground that the jury were thereby, in effect, advised that they must find that there was an express contract personally participated in by each of the three parties, which precluded them from finding the possibility of the appellant having the benefit of an implied contract; that such a contract might be implied from the facts and circumstances proven; and further excepted to the first portion of the instruction as being in the abstract and not applicable to the facts in the case, and misleading to a layman jury, being calculated to leave the impression that, unless the evidence showed a personal contract between Z. and H. personally participated in by them, the legal relations between them were not changed. While the court gave

other instructions to the jury, despite the fact that appellant requested two instructions squarely raising the issue and, by his objection to instruction No. 3, supra, again called the court's attention to its failure to instruct the jury that a contract might be implied where an agreement, in fact, is presumed from the acts of the parties, we are of the opinion that that question was not fairly presented to the jury by the instructions as a whole. By its refusal to give appellant's requested instruction above quoted, and by giving instruction No. 3, we believe that the court unduly limited the rights of the defendant Z. to an express contract, and that the failure to fairly present this question to the jury was prejudicial error.

With reference to the error assigned in permitting Brown, M.'s attorney in the federal suit, to produce in court letters from his former client and testify concerning conversations with him, we are of the opinion, in view of the entire record, that prejudicial error was not thereby committed. We do not determine, therefore, either its admissibility or the ethical propriety of such testimony by former counsel in a suit wherein the former client, while made a party defendant, is not served with process therein, and no judgment against him is taken.

The judgment and order appealed from are reversed, and the case remanded for a new trial.

BURCH, P. J., and POLLEY, SHERWOOD, CAMPBELL, and BROWN, JJ., concur.