363 So.2d 739 (1978)
GUARANTY MORTGAGE COMPANY OF NASHVILLE d/b/a Nashville Guaranty Mortgage Company and First American National Bank
v.
RYAN SUPPLY COMPANY.
No. 50617.
Supreme Court of Mississippi.
October 4, 1978.
Rehearing Denied November 15, 1978.
Butler, Snow, O'Mara, Stevens & Cannada, Robert C. Cannada, George H. Butler, Charles E. Gibson, Jackson, for appellant.
Brunini, Grantham, Grower & Hewes, John A. Welsch, Jr., Jackson, for appellee.
Before ROBERTSON, P.J., and SUGG and COFER, JJ.
COFER, Justice, for the Court:
This is an appeal from the Chancery Court of the First Judicial District of Hinds County, wherein, under circumstances presently to be related, a final decree was rendered cancelling a foreclosure sale and adjudicating to appellee ground rents.
Ryan Supply Company (Ryan Supply), a Delaware corporation, qualified to do business in Mississippi, owned lands termed "Jacksonian Plaza" in the pleadings and trial and so hereinafter called. It, on October 28, 1971, executed a lease on the ground described in the lease instrument, to the Kroger Company (Kroger), an Ohio corporation, doing business in Mississippi. Kroger *740 accepted the lease and executed it as lessee or tenant therein on December 31, 1971. The lease is hereinafter referred to as the Kroger lease.
Paragraph 11 of the Ryan Supply lease to Kroger provides:
11. Tenant may assign or sublet all or any part of the demised premises at any time during the primary or renewal term, so long as it remains primarily responsible for paying rent as herein stipulated. (Emphasis supplied).
(The lease has a long primary term with liberal renewal privileges).
At the leasing, it was Kroger's purpose to develop the land as a family shopping center with its own store and other businesses where general family needs might be purchased. It abandoned this family center purpose, however, and assigned the ground lease under the authority quoted above to Charles A. Watkins, doing business as Watkins Investments, the assignment being dated August 10, 1972. In this assignment it was agreed that "the assignor, however, remains primarily responsible as stipulated in paragraph 11 of said lease." A rental consideration agreement, not necessary to this decision, was arrived at between Kroger and Watkins.
On October 11, 1972, Watkins, doing business as Watkins Investments, assigned the Kroger lease to Watkins Tenn.-Miss., Incorporated. Watkins had theretofore entered into a store lease with Kroger, and the assignment by Watkins to Watkins Tenn.-Miss., Inc., was made subject to the said store lease.
Paragraph 15 of the Ryan Supply-Kroger lease, in presently pertinent part, reads:
15... .
Tenant shall have the right to mortgage this lease, and to assign, pledge or hypothecate it as security for any such mortgage to any institutional investor authorized to make leasehold mortgage loans in this state.
Landlord agrees, upon request of Tenant, and within 15 days thereafter, to execute and deliver a mortgage so as to subject the reversionary interest of landlord in the demised premises to the lien of the mortgage procured by Tenant. The mortgage to be executed by the Landlord pursuant to this provision shall expressly provide that nothing contained therein shall create or impose any personal obligation, liability or responsibility on the part of the Landlord for the payment of any sums due thereunder or for the performance of any obligation or covenant on the part of anyone else to be performed thereunder.
It is understood and agreed by the parties hereto that nothing contained in this lease shall require or impose the obligation on Landlord to execute or sign any note or notes, the payment of which is or are secured by a mortgage to be executed by Landlord pursuant to this provision.
Watkins Tenn.-Miss., Inc., as assignee of the lease and with the authority provided in the part of the lease's paragraph 15 quoted next above, negotiated a loan for $1,150,000 from Guaranty Mortgage Company, (Guaranty), a Tennessee corporation doing business as Nashville Guaranty Mortgage Company, due on or before six months from its date, October 17, 1972, with interest at 8 percent per annum. This loan was secured by a deed of trust of that date, wherein Ryan Supply joined, which deed of trust included Ryan Supply's fee simple title to the ground in the Kroger lease and the assigned leasehold interest therein of Watkins Tenn.-Miss., Inc. Ryan Supply had as reflected above, bound itself to join in such mortgage to the extent only of giving its reversionary interest as security for the loan without making itself personally liable therefor. Called upon to make good its promise contained in said paragraph 15, Ryan Supply caused insertion therein of the following:
SPECIAL PROVISION: Without waiving any right and reserving unto itself every right secured to it by virtue of Paragraph (11) Eleven of that certain lease by and between the undersigned Ryan Supply Company and the Kroger Co., dated October 28, 1971, a memorandum of which is of record in Deed Book *741 1986, Page 394, the undersigned Ryan Supply Company does hereby subordinate its interest to this deed of trust and note to secure the indebtedness secured hereby, which subordination shall exist for the life of the indebtedness secured by said deed of trust; the said Ryan Supply Company hereby executes said deed of trust "to unconditionally mortgage the fee simple title as an inducement to Guaranty Mortgage Company of Nashville, a Tennessee corporation, d/b/a Nashville Guaranty Mortgage Company or other lending institution to make its loan, and the deed of trust that it is granting will continue for the life of this loan regardless of whether the leasehold may be terminated, and any conditions of the leasehold contrary to the Guaranty Mortgage Company of Nashville, a Tennessee corporation, d/b/a Nashville Guaranty Mortgage Company deed of trust are made subordinate thereto"; provided, however, that nothing contained herein shall create or impose any personal obligation liability or responsibility on the part of the Lessor, Ryan Supply Company, for the payment of any sums due hereunder or for the performance of any obligation or covenant on the part of anyone else to be performed hereunder.
* * * * * *
In the event tenant shall default in the payment of sums due under the terms of this deed of trust or any other covenants contained herein, the Guaranty Mortgage Company of Nashville d/b/a Nashville Guaranty Mortgage Company, for and in consideration of the Ryan Supply Company subordinating its reversionary interest, agrees that they shall within 60 days or prior to the beginning of any foreclosure proceeding shall notify Ryan Supply Company of such default and Ryan Supply Company shall have the first option to cure said default and by so curing the default shall become the owner of the lease and the rentals and benefits accruing thereunder of Watkins Tenn.-Miss., Inc. with the Kroger Company[*] on the buildings located on the hereinabove described premises.
[*] or other mercantile stores
In its completed form above, the signature lines there appears the wording, "In testimony whereof witness the signature of the Grantor this 17th day of October, 1972." followed by signatures as follows: "/s/ Charles A. Watkins, Watkins, Tenn.,-Miss., Inc. by Charles A. Watkins," and "/s/ Thad J. Ryan, Ryan Supply Company by Thad J. Ryan, President."
While the secured indebtedness involved herein was due, as shown hereinabove, six months after October 17, 1972, and default arose in the payment, there appears no activity between Watkins Tenn.-Miss., Inc. and Guaranty until June 19, 1974, on which date the debtor executed to Guaranty, or bearer a demand note for $1,150,000, "with interest at 2% over prime, based on New York's Chase Manhattan Bank's prime rate, with a floor of ten percent (10%) per annum. Interest shall be payable monthly in advance from date hereof." (After the new note someone in Guaranty's office marked the old one "cancelled.")
Ryan, testifying, had no knowledge that the new note just noticed had been executed, until about the time the foreclosure notice was given to him, as required in the special provisions in the deed of trust set out hereinabove. Both Watkins, Tenn.-Miss., Inc., and Watkins personally became bankrupt and there was default in the indebtedness, thus secured and evidenced, and Guaranty caused foreclosure on the mortgage and became purchaser at the sale. Ryan attended the sale, is not shown to have articulated thereat any objections or questions as to the legality thereof, and, on the witness stand, testified that he did not bid on the property "because of the type construction of the buildings out there, because of the kind of leases that are on that property, Thad Ryan as a businessman could not offer $900,000 plus one. The third factor being the kind of taxes that the city has assessed against that property out there. Those  for those three reasons  primary reasons, it was not a business project as far as we were concerned. In fact, no *742 one else was there that made any other offer. There was one offer made, one offer accepted and that buttoned it up  for the three reasons just outlined."
(The foreclosure sale was on the 28th day of October, 1975, on which day trustee's deed to the property was executed to Guaranty. Later in a transaction, Guaranty conveyed the land to its parent company, First American National Bank of Nashville, Tennessee (First American) and the perfected pleadings in this cause show Guaranty and First American as defendants.)
On December 5, 1975, Ryan Supply brought this suit praying cancellation of the deed of trust and the trustee's deed to Guaranty as clouds on its title insofar as they affect the title and interest of Ryan Supply in Jacksonian Plaza, and that Guaranty be enjoined from interference with the payment of rentals to it under the lease to Kroger. On February 17, 1976, Ryan Supply amended its bill of complaint to include First American as a defendant and to cancel the conveyance of the property to it by Guaranty and to enjoin it as had been prayed against Guaranty.
As basis for its prayer for relief, Ryan Supply alleged that it was not a maker of the note or the indebtedness secured by the deed of trust here involved, but had "in fact, made its reversionary interest in Jacksonian Plaza collateral security for the debt of a third person and such property stands in the position of a surety for the maker thereof;" that it is informed and believes that the original note was not paid, and that, on June 19, 1974, Guaranty "accepted in lieu of the aforesaid note a demand note dated June 19, 1974, in the principal amount of $1,150,000 payable on demand with interest at 2% over prime based on New York's Chase Manhattan Bank's prime rate with a floor of 10% per annum," which change in the secured indebtedness was made without the knowledge or consent of Ryan Supply; that, in addition to the extension for the payment of the debt resulting from Guaranty's failure to collect the debt in a reasonable time after its due date, acceptance of the June 19, 1974, note operated a material change and alteration of the indebtedness secured and of the surety's contract in these certain respects at least: (1) it was an extension of time for payment; (2) it increased the interest at least 2 percent and more based upon the fluctuating interest rate in the note set out; (3) it provided a possibility of usury depending upon Chase Manhattan Bank's prime rate; and (4) it substituted a non-negotiable note for one which purported to be a negotiable note, and that the effect of these changes was to discharge the deed of trust as to the interest of Ryan Supply.
It further alleged that in spite of Ryan Supply's release resulting as above claimed, Guaranty refused to "execute the release and cancellation of the interest of Ryan Supply from said deed of trust and proceeded to attempt to foreclose such deed of trust by instruments which purport to cover the interest of Ryan Supply," and Ryan Supply is entitled to have both the deed of trust and the trustee's deed set aside and cancelled insofar as they affect Ryan Supply's title and interest in Jacksonian Plaza.
It further alleged that its joinder in the deed of trust did not convey or assign to Guaranty any of Ryan Supply's contractual rights with regard to Kroger as to the ground rents due to Ryan Supply from Kroger, and that the deed of trust to Guaranty carefully reserved to Ryan Supply its rental rights under paragraph 11, quoted early hereinabove, of its ground lease to Kroger, in spite of which Guaranty has demanded that Kroger pay to it all rents accruing under the lease. Asserting that the rents belong to Ryan Supply, even if title to the land has been divested from it, Ryan Supply would be entitled to injunction against Guaranty's interference with the payment of the rents by Kroger to Ryan Supply.
For some length of time the rents have been paid in escrow or are otherwise held to await the outcome of the suit.
Guaranty and First American denied that Ryan Supply had joined in the deed of trust for some special purpose; admitted that Ryan Supply was not a maker in the note but asserted that Ryan Supply executed the *743 deed of trust for valuable consideration and that it had obligated itself to do so, and denied that Ryan Supply had made its reversionary interest "a collateral assurance security debt for a third person," and further denied that the property stands in the position of a surety for the maker thereof, but alleged that Ryan Supply was obligated to include its said land for valuable consideration by virtue of its lease with Kroger, and charged that the execution of the mortgage by it was not to secure the obligation of another but in furtherance of an agreement largely for Ryan Supply's own benefit.
Defendants Guaranty and First American averred that the $1,150,000 was advanced to be used for construction of improvements in Jacksonian Plaza, and that Ryan Supply knew that the loan was for the purpose of building a Kroger store and other improvements on the shopping center, and they denied that there was a change in the indebtedness and specifically that any change was made without the knowledge and consent of Ryan Supply.
At the conclusion of the testimony, the chancellor called for briefs, saying:
What would you Gentlemen like to do? Submit a short brief? I would like to have some time to study over it, and I wish you Gentlemen in your brief would help the court determine which one of these situations here are waived or if all of them are as to the paragraph 11. That's the first thing he said without waiving any right. I wish you'd tell me how far it goes and you tell me when it stops.
In his opinion the chancellor noted that "the main issues before the court are the effect, if any, of the action of Guaranty Mortgage Company after the deed of trust signed by Ryan Supply as to releasing the reversionary interest of Ryan Supply from the deed of trust. It will be noted that there were some changes in the note as to the interest rates and so forth after the signature of Ryan Supply on said deed of trust."
He took note of the submission of the briefs, and of Ryan Supply's argument therein that Guaranty's acts after the deed of trust had the effect of fully releasing Ryan Supply's reversionary rights in Jacksonian Plaza from the deed of trust, observed that "there were some changes in the indebtedness before this Court as to extension of time, interest rates and a new note," and without making a finding upon the issue of whether the reversionary interest was released, went to the demand of Guaranty for the Kroger rents and found for Ryan Supply as to this issue.
The chancellor's decree thereon held, however, that:
10. Ryan Supply was a mere surety and the taking of the new note of June 19, 1974, by Guaranty Mortgage from Watkins Tenn.-Miss., Inc. constituted a material change and alteration in the indebtedness secured by the deed of trust which had not been consented to by Ryan Supply and discharged said deed of trust insofar as it affected the reversionary interest of Ryan Supply in Jacksonian Plaza,
and cancelled the deed of trust, trustee's deed, and deed from Guaranty to First American as clouds upon Ryan Supply's title insofar as they purport to affect Ryan Supply's interest in the land, adjudged to Ryan Supply the recurring rents from Kroger under the lease, and enjoined Guaranty and First American from making further claim to the rents from Kroger arising from the lease.
On appeal therefrom, Guaranty and First American have assigned nine errors, which we believe may be condensed into two issues and these must be resolved in favor of appellants operating a reversal as to the efficacy of the foreclosure and as to whom the rents from Kroger, after foreclosure, belong. These issues are (1) whether Ryan Supply's reversionary interest in the land was released from Guaranty's deed of trust by the delivery by Watkins Tenn.-Miss., Inc. and Watkins, individually, of the June 1974 note, and its acceptance by Guaranty; and (2) if the foreclosure was legally done, *744 whether Ryan Supply continued thereafter to be entitled to the Kroger rents.
Ryan Supply strongly urges that it was a mere surety, as found by the chancellor, and that the June 1974 note to Guaranty discharged it as such. It is argued, and correctly so, by appellants that Ryan Supply had a pecuniary interest in the transaction, of which this loan was a part and it was not a surety. That the construction of the shopping center bore for Ryan Supply a lively expectation of pecuniary and property gain is articulated in the testimony of Ryan Supply's president Ryan on direct examination, when he was being interrogated on the subject of Kroger's abandonment of its plan to develop the leased premises as a family center:
Q. So do I understand this that they sent you back a lease and then told you that they were not going to build a family center?
A. That is correct.
Q. Did they tell you they were not going to build the family center at any point before they sent you back the lease?
A. No, sir, had they told me that, I would never have executed the lease because the lease was executed on two considerations. The basic consideration which was the land rental, which was small, and the second consideration which was the building of some eighty, ninety thousand square feet of building facility that under the terms of the lease would revert to the realty in 25 years in the event that the first option was not exercised or any options thereafter. (Emphasis supplied).
This purpose of gain permeated the Kroger lease, wherein in its paragraph 15, as hereinabove set forth, it bound itself on Kroger's request "to execute and deliver a mortgage so as to subject the reversionary interest of landlord in the demised premises to the lien of the mortgage procured by tenant ..." The same anticipation of gain was present when, as Ryan Supply had bound itself to do in the Kroger lease, it carried through and, reserving to itself only the Kroger paragraph 11 rent understanding, subordinated "its interest to this deed of trust and note to secure the interest secured hereby ... `the said Ryan Supply Company hereby executed said deed of trust' to unconditionally mortgage the fee simple title as an inducement to Guaranty Mortgage Company of Nashville, Tennessee ... to make its loan . ." (Emphasis added).
While not shown in the early lines of the deed of trust as a grantor, Ryan Supply signed the instruments in lines providing for grantor's signature or signatures.
Appellants cited Matthews v. Hinton, 234 Cal. App.2d 736, 44 Cal. Rptr. 692 (1965), as a case bearing close similarity to this case now under consideration. In that case appellants owned an area of unimproved land which they leased on a longtime basis to a lessee on a rental arrangement not here pertinent, giving the lessee power to sublet or assign the lease. The owners in the lease instrument agreed to subordinate their title and to join in any deed of trust given to secure construction loans for improving the leased property specially providing against personal liability for such loans. The lessee sublet the property to sublessees who desired to borrow money thereon for development purposes and to have the Matthews owners to subordinate their interest to a deed of trust. The loan was procured, secured by a deed of trust executed by the sublessees and their wives and the Matthews appellants, "all of whom were collectively designated as `[t]rustor.'" The Matthews owners did not sign the note evidencing the debt. The sublessees defaulted and the mortgagee began foreclosure proceedings which, despite a suit to enjoin sale, were carried forward to sale under the deed of trust. The Matthews parties bought back the property either at the sale or thereafter and filed in the injunction suit a cross-complaint charging that the mortgagee had wrongfully sold the property and sought an amount alleged to be the market price of the land. As allegations upon which they based their prayer for relief, *745 they said that they were sureties only and that mortgagee should have resorted to other assets of the sublessees the principal debtors; that after execution of the deed of trust, the mortgagee lent to sublessees other money used for purposes other than construction of improvements on the land; that the total amount advanced exceeded the limitation in the subordination clause in the lease; and that the due date on the promissory note was extended without the Matthews' consent, thus relieving them from liability.
On the Matthews' appeal from a summary judgment against them the appellate court said:
The role in which appellants contracted is depicted on the face of the papers. Appellants were the owners of unimproved land. They leased it to a developer for 65 years for ground rentals aggregating $309,000. As lessors they had a direct financial interest in the construction of improvements which would produce income and ground rent. The lessees or sublessees might have attempted to put up their tenancy for years as security for construction loans. (See Chapman v. Great Western Gypsum Co., 216 Cal. 420, 425, 14 P.2d 758, 85 A.L.R. 917). A fee simple estate would be far more attractive security to a lender. For the promotion of their personal financial interests appellants agreed with their tenants to subordinate their reversionary estate to any future trust deed securing a construction loan. They fulfilled that agreement by means of a trust deed in which they joined with their tenants as "trustor." In so doing, they contracted directly with the lender, exposing their reversionary interest to direct liability independently of auxiliary collection attempts against the borrowers. There was nothing in the trust deed to tell the lender that its power of sale was limited to the sublessees' estate for years. The liability of appellants' reversionary interest was primary, not secondary. In signing the trust deed as "trustor," appellants as principals entered into a direct contractual relationship with Diamond for their own financial benefit. Having signed the trust deed as principals, they subjected their reversionary interest to primary liability.
(44 Cal. Rptr. at 696).
On the record herein, we are of the opinion that Ryan Supply was not a mere surety but was, to the extent of the special provisions in the deed of trust and its joinder therein, subject to those special provisions, a grantor, and may not claim the rights and defenses available to sureties.
Should, however, it be considered that Ryan Supply's participation in the deed of trust was only as a surety, it is aptly pointed out by appellants that when the 1974 demand note was executed and accepted, the debt secured by the deed of trust was in default and, therefore, the note evidencing it thereby became a demand note, and the 1974 note is specifically made payable on demand, therefore, granted no extension of time. 74 Am.Jur.2d, Suretyship, § 60 (1974). Appellant cites Industrial Loan and Investment Company v. Miller, 163 Miss. 288, 141 So. 587 (1932), and Graham v. Pepple, 132 Miss. 612, 97 So. 180 (1923), upon the authority of which they argue that to release a surety from liability because of extension of time of payment without his consent, the extension must be for a definite period of time, upon an express agreement, supported by a valuable consideration and the agreement must be an enforceable one against earlier suit by the creditor.
They cite and quote from Brown v. Prophit, 53 Miss. 649 (1876), and Love v. Clark, 171 Miss. 758, 762, 158 So. 484, 485 (1935), and reason therefrom that the changed increased interest likewise did not release Ryan Supply, if it was a surety.
In addition to these arguments, that the 1974 note and its higher interest rate did not release Ryan Supply even if held to occupy the position of surety, we give some mention to the fact that in the deed of trust, except as to the Kroger rents, Ryan Supply "hereby executes said deed of trust `to unconditionally mortgage the fee simple title as an inducement to Guaranty . . *746 to make its loan ...'" Black's Law Dictionary, p. 1694 (1968), defines the word "unconditional" as "not limited or affected by any condition ..." Regardless of what specifically Ryan Supply had in mind in the execution of the deed of trust unconditionally, it is true that, if the chancellor's decree is permitted to stand, then Ryan Supply will have its land enhanced in value by the construction of upward of $1,000,000 of improvements thereon and appellants will be denied recovery of the amount they expended under the deed of trust. In reversing we are on solid ground in law, and are doing equity.
Reaching the issue as to the rents, it is repeated here that Kroger agreed, in its lease with Ryan Supply, to pay rents and to remain liable therefor, even though it might, as it did, exercise the authority in the lease to assign or sublet the land leased, and that, while complying with paragraph 15, of the lease document, by giving as security the land, Ryan Supply waived every right except that secured to it by paragraph 11 of the Kroger lease, (that making Kroger responsible for the rents).
The second phase of Ryan Supply's bill of complaint and its prayer is the assertion by it that, even should the court find the foreclosure legal and valid, the deed of trust reserved to Ryan Supply the rents under paragraph 11 of the Kroger lease and it is, nevertheless, entitled to an injunction against Guaranty from interfering in any manner with the payments of said rents to Ryan Supply. It prays relating thereto that Guaranty (and on amendment to make First American a defendant) that First American be enjoined and prohibited from interfering in any manner with the payment of rents under the Kroger lease to it, Ryan Supply.
Ryan Supply concedes that rents pass with the land unless reserved, but says that Ryan Supply expressly reserved the Kroger rents and is entitled to the relief sought with reference thereto. Appellants counter with the argument that the reservation of rents as provided in paragraph 11 of the Kroger lease and excepting them in the deed of trust to Guaranty could only be so long as Ryan Supply owned the lands. They further point to the provision of right to protect the reversionary interest in the land, which would retain to it the rents thereon, through curing default, notice of which default the mortgagee was required to give and did give, in timely manner.
The general rule, as announced in 49 Am.Jur.2d, Landlord and Tenant § 530 (1970), is that the grantee of lands is entitled to rents accruing after the transfer. This general rule yields to the right thereto of the grantor where the rents have been reserved. Participation by Ryan Supply in the deed of trust to Guaranty was subject to the reservation to Ryan Supply contained in paragraph 11 of the Kroger lease. That paragraph authorized Kroger to "assign or sublet ... so long as it remains primarily responsible for paying rent as herein stipulated." Neither paragraph 11 nor the deed of trust operated to cause the rents to be paid to Ryan Supply regardless of any change in its status as owner or otherwise of the land in the Kroger lease.
It is our conclusion that the record clearly warrants the decision that Ryan Supply was entitled to all rents accrued up to the foreclosure date, and the purchaser at the sale became entitled to all rents which accrued since that date.
The decision of the lower court is reversed and judgment will be rendered here for appellants on both the issues of validity of the foreclosure sale and of party or parties entitled to the Kroger lease rents.
At some point not clear in the record the parties began impounding the rents to await decision as to their disposition. We remand the case with directions that of the impounded rents, those which accrued before the foreclosure sale (October 28, 1975), be paid to Ryan Supply and those becoming due after the sale be disbursed to First American.
REVERSED AND JUDGMENT HERE FOR APPELLANTS; REMANDED FOR DISPOSITION OF RENTS HELD IN ESCROW.
*747 PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM and LEE, JJ., concur.
BOWLING, J., takes no part.