**STATE OF WISCONSIN INVESTMENT BOARD, Plaintiff, Appellee and Cross-Appellant,**

v.

**Gene R. HURST; Alice L. Hurst; Roger W. Anderson, Trustee; and O.B. Rekow, Trustee, Defendants, Appellants and Cross-Appellees,**

**Brookings Mall, Incorporated; Calvin Fercho; Brookings Mall, A Partnership; James A. Craig, Trustee in Bankruptcy; and Fred O. Watson Co., Defendants and Cross-Appellees.**

**Nos. 15522, 15531 and 15534.**

Supreme Court of South Dakota.

Argued April 23, 1987.

Decided Aug. 12, 1987.

---

Stuart L. Tiede of Woods, Fuller, Shultz & Smith, Sioux Falls, for plaintiff, appellee and cross-appellant.

Alan F. Glover of Denholm and Glover, Brookings, for defendants, appellants and cross-appellees.

Robert E. Hayes of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for defendants and cross-appellees.

MILLER, Justice.

Gene R. Hurst (Hurst) and Roger W. Anderson (Anderson) (collectively "Owners") owned twenty acres of real estate located in the City of Brookings, South Dakota. Hurst and Anderson were real estate speculators and desired to develop the land for use as a shopping mall. In December 1971, Owners executed a ninety-nine-year lease with Ericson Development Company, Inc. (Ericson) under which Ericson would construct, operate, and maintain a shopping mall on the leased property. The lease contract also provided that Owners would join in any mortgage necessary to finance such a mall.

In April 1974, Ericson assigned, with Owners' approval, its interest as lessee to Brookings Mall, Inc. (Mall). Construction was completed on Mall by early 1975. (Mall was built on Lot 2 of Owners' land,

which land was platted as containing Lots 1 and 2, of roughly equal size.)

In August 1976, Mall secured a $3,050,-000 loan from the State of Wisconsin Investment Board (SWIB). This loan represented the permanent financing for the project and apparently was used to pay off the interim financer. SWIB required that Owners join in execution of the mortgage and security agreement pledging Lot 2, among other things, as security for repayment of the promissory note.

By June 1982, Mall was in default under the terms of the promissory note. That same month, SWIB and Mall entered into a "mortgage note modification agreement," agreeing that the $27,715.37 monthly payments of interest and principal would be reduced to monthly payments of $19,-382.04. The parties also agreed that $4,551.25 would be added to the principal amount each month beginning in March 1982 and continuing through September 1984. Under this schedule, the principal balance after the September 1984 payment was $3,013,083.89. Following the February 1982 payment, the principal balance on the note was $2,871,995.14. Owners had no knowledge of the modification agreement or the terms thereof until SWIB commenced foreclosure proceedings in 1984.

In December 1984, SWIB filed its complaint for foreclosure and a motion to enforce the assignment of leases and rents. In January 1985, Mall filed a voluntary petition for bankruptcy. In March 1985, SWIB obtained relief from the automatic stay imposed by the bankruptcy proceedings. The circuit court then granted SWIB's motion to enforce the lease and rents assignment. After a trial on the merits, the circuit court, in July 1986, entered findings of fact and conclusions of law. A judgment and decree of foreclosure in favor of SWIB was filed on August 18, 1986.

The proceedings in the circuit court also involved a counterclaim by Owners, claiming the right to receive rents from Mall and its sublessees under their original lease with Mall. Owners were paid no rent after December 1984. SWIB purchased the property at the mortgage foreclosure sale in September 1986. The trial court ruled for SWIB on this issue.

## ISSUES

Owners argue on appeal that they signed the mortgage of their property as sureties rather than principals; that the mortgage note modification agreement entered into between Mall and SWIB without their knowledge or consent exonerated them as such sureties; and that they continue to be entitled to the rents from the Mall through the period of redemption. By notice of review, SWIB argues that it is entitled to foreclose the leasehold interests of Owners and Mall in Lot 1, as well as Lot 2.

## DECISION

### 1. WHETHER OWNERS ARE PRINCIPALS OR SURETIES.

South Dakota statutes dealing with suretyship include SDCL 56–2–1 which defines suretyship as "a contract by which one who at the request of another and for the purpose of securing to him a benefit becomes responsible for the performance by the latter of some act in favor of a third person or hypothecates property as security therefor." SDCL 56–2–7 states: "Whenever property of a surety is hypothecated with the property of the principal, the surety is entitled to have the property of the principal first applied to the discharge of the obligation." SDCL 56–2–2 provides that: "One who appears to be a principal whether by terms of a written agreement or otherwise may show that he is in fact a surety except as against persons who have acted on the faith of his apparent character of principal."

On its face, Owners argue, and it would seemingly appear, that the mortgage of their reversionary interest in the real estate fits within the definition, rights and liabilities of suretyship as set forth in SDCL ch. 56–2. However, we must look to case authority for an interpretation of the statutory language.

Suretyship is a contractual relationship, which results from two persons

becoming obligated to the same creditor with one of them bearing the ultimate liability. In other words, if the debt is enforced against the surety, he then is entitled to be indemnified by the one who should have paid the debt before the surety was compelled to do so. However, "one who receives and retains the consideration or benefit of a contract cannot occupy the position of surety." 74 Am.Jur.2d *Suretyship* § 3 (1974). Hence, a person who makes a contract for the purpose of securing to himself a benefit rather than for securing to another a benefit, may be classified as a principal. *Heinrich v. Magee*, 52 S.D. 371, 217 N.W. 631 (1928).

It is immaterial in what form the relation of principal and surety is established, or whether the creditor was or was not contracted with in that relation. The relation is vested by the arrangement and equities between the debtors, and may or may not be known to the creditor....

....

'[Suretyship] is determined by inquiring who received the consideration of the contract, or who, according to the arrangements between the parties, ought to pay the debt.'

*Heinrich*, 52 S.D. at 378, 217 N.W. at 634 (citations omitted); 72 C.J.S. *Principal & Surety*, §§ 4, 9 (1987).

A California court in *Matthews v. Hinton*, 234 Cal.App.2d 736, 44 Cal.Rptr. 692 (1965), decided a suretyship/principal issue similar to the one currently before us. The Matthews owned an unimproved tract of land which they leased for sixty-five years to a developer. Matthews gave the developers the power to sublet and assign. The agreement also provided that the Matthews would subordinate their title and join in any deed of trust given to secure construction loans for improving the property. The developers' sublessees borrowed $100,000 from a finance corporation and secured the loan with a deed of trust executed by both the Matthews and the sublessees. As in this case, the owner/mortgagors did not sign the promissory note evidencing the debt. The sublessees defaulted on the note

and the finance corporation foreclosed. Matthews sued the corporation, alleging that they wrongfully sold the property at a trustee sale. Matthews argued that since they were sureties only, the finance corporation was required to resort to the assets of the principal debtors prior to executing on the owners.

In holding the Matthews to be principals, the California court stated:

The role in which appellants contracted is depicted on the face of the papers. Appellants were the owners of unimproved land. They leased it to a developer for sixty-five years for ground rentals aggregating $309,000. As lessors they had a direct financial interest in the construction of improvements which would produce income and ground rent.... *For the promotion of their personal financial interests* appellants agreed with their tenants to subordinate their reversionary estate to any future trust deed securing a construction loan. They fulfilled that agreement by means of a trust deed in which they joined with their tenants as 'trustor.' In so doing, they contracted directly with the lender, exposing their reversionary interest to direct liability independently of auxiliary collection attempts against the borrowers.... Having signed the trust deed as principals, they subjected their reversionary interest to primary liability. (Emphasis supplied.)

234 Cal.App.2d at 741, 44 Cal.Rptr. at 696.

In this case, the trial court appropriately found that Owners anticipated gaining personal economic benefit from development of the shopping mall upon their property. Owners held an unimproved section of bare land which they leased for ninety-nine years at an annual rental of six percent of all rentals collected by the lessee from tenants' sublessees, but in no event less than $15,000. Eventually, the improvement would have been turned over to Owners or their heirs cost free. Owners were aware of the fact that the lease contained a requirement that they might be required to pledge their fee interest in the property if lessees chose to finance the improvements upon the property and the

lender required that Owners join in such mortgage. A fee simple estate would be much more attractive security to a lender. For the improvement of their personal financial situation, Owners agreed with their tenant to subordinate their reversionary estate to any future mortgage in order to secure a construction loan. *Matthews* is on point and we adopt its reasoning. *See also Guaranty Mtg. Co. of Nashville v. Ryan Supply*, 363 So.2d 739 (Miss.1978), which followed *Matthews*.

Owners argue that holding them to be principals would render that portion of SDCL 56-2-1, which provides that a suretyship arises when one "hypothecates property" to secure the debt of another, a nullity. To the contrary, we are not holding that when one hypothecates property to secure the debt of another that he is *automatically* a principal. We merely hold such a relationship arose *under the facts of this case.* Under SDCL 56-2-2 Owners could attempt to establish that they were in fact sureties, even though the mortgage was arguably signed as principals. "Where the relationship is not apparent on the face of the instrument, the burden is on a person claiming to contract as surety to prove the fact of suretyship." 72 C.J.S. *Principal & Surety* § 11(b) (1987).

Owners did not meet their burden of proof. As the original lease and subsequent agreements of the parties indicate, Owners seemingly signed the mortgage in the capacity of principal, as they had great personal financial benefits to gain in doing so.

## 2. WHETHER THE SURETIES HAVE BEEN DISCHARGED.

Our ruling on the first issue renders this issue moot.

## 3. WHETHER OWNERS ARE ENTITLED TO POST-FORECLOSURE RENTS.

 Owners received no monthly rent beginning with December, 1984, the month SWIB commenced foreclosure. Even assuming SWIB had the right to foreclose, Owners argue that they still would not lose their right to collect rents due by virtue of the terms of the lease with Ericson (assigned to Mall) until foreclosure was complete or the statutory period of redemption had run. This court specifically addressed this issue in *Aetna Life Ins. Co. v. McElvain*, 363 N.W.2d 186 (S.D.1985), where we pointed out that the right of possession and right to rents and profits remains in the mortgagor until the expiration of the period of redemption. "However, in *First Federal Sav. & Loan v. Clark Inv. Co.*, 322 N.W.2d 258 (S.D.1982), this court held that a mortgagor can contract away its rights to rents and profits." *Aetna, supra* at 191.

The mortgage signed by Owners here provided:

> In order to secure the payment of principal and interest and premium, if any, on the Note and to secure the performance and observance by Mortgagors of each and every term ... contained herein and in the Note ... Mortgagors have granted ... unto Mortgagee ... all right, title, and interest of Mortgagor, ... in all reversions and remainders to such real estate and all rents, income, issues, profits, royalties and revenues derived from or belonging to the Mortgaged real property and improvements and fixtures thereon and the right to possession upon default; which mortgage of such rents, income, issues, profits, royalties and revenues is supplemented by an assignment of leases and rents[.]

This assignment of rents specifically contained in the mortgage and signed by Owners is as explicit as the assignment in *Aetna.* We also held in *Aetna* that the 1983 amendment to SDCL 21-47-17 which provides "a foreclosure may not be considered to be satisfaction of an assignment of rents agreement under the mortgage" made an assignment of rents and profits on non-homestead property valid from the time of default until the end of the period of statutory redemption. *Aetna, supra* at 191. The trial court therefore properly granted SWIB the right to collect rents during this period.

## NOTICE OF REVIEW

## 4. WHETHER SWIB IS ENTITLED TO THE OWNERS' LEASEHOLD INTEREST IN LOT 1.

In May 1978, Mall assigned its lease of Lot 1 to Fred O. Watson Co. (Watson). In

April 1983, Owners amended their lease with Mall to include only Lot 2. Apparently Owners then contracted directly with Watson for the lease of Lot 1.

SWIB amended its complaint to assert the right to foreclosure on Lot 1. The trial court denied this claim and held that the mortgage held by SWIB was secured by Lot 2 only. SWIB does not claim Owners mortgaged their fee interest to Lot 1, but only their leasehold interest on the lot. SWIB's claim is based on the following alleged facts: The Owners/Ericson's lease and lease amendment describe the entire twenty-acre tract; Owners mortgaged their interest as lessors under the ninety-nine-year lease, including their rights as lessors to Lot 1; the second amendment to the lease which noted that the leased property had been platted into Lots 1 and 2 and that Mall assigned its interest in Lot 1 to Watson, was not executed until April of 1983, after the mortgage was executed. SWIB also alleges that the mortgage itself indicates that Owners mortgaged their interest in Lot 1. However, the portions of the lease to which SWIB points are ambiguous, and the trial court properly received extrinsic evidence to assist it in ascertaining the parties' intent.

It is true that Owners included their lessor rights in the written mortgage. However, because the mortgage itself states on its face that the encumbered property included only Lot 2, the trial court was not clearly erroneous in holding that the lessors' interest was mortgaged only as to that lot.

Affirmed.

All the Justices concur.