[No. 41234.    En Banc.    June 17, 1971.]

ADGIE LEUNING, *Respondent*, v. MARVIN HILL *et al., Appellants.*

*Perry B. Woodall* and *Elwood Hutcheson,* for appellants.

*Felthous, Brachtenbach, Peters & Schmalz, Joseph C. Murphy,* and *Robert A. Felthous,* for respondent.

HAMILTON, C.J.—Three issues seek resolution by this appeal. The first presents a question of initial impression in this state, the second a factual dispute, and the third revolves about an evidentiary ruling.

Respondent, Adgie Leuning, individually and as personal representative of the estate of her deceased husband, W. C. Leuning, instituted this action seeking recovery from appellants, Marvin and Noriene Hill, of moneys paid by her husband's insurer, under a group credit life insurance policy, in satisfaction of a debt evidenced by a promissory note signed by Mr. Hill and Mr. and Mrs. Leuning. Additionally, respondent sought accounting for and recovery of rents claimed due under a farm lease previously entered into by the Leunings, as lessors, and the Hills, as lessees.

The cause came on for hearing before the trial court sitting without a jury. From findings of fact, conclusions of law, and judgment in favor of respondent, the Hills appeal.

The evidence adduced at trial reveals the following circumstances as being relevant to the appeal.

The Leunings were longtime owners of farm land, consisting of a fruit orchard and some open ground, located in the Yakima valley. Mr. Leuning farmed the property himself until 1961, when ill health intervened. He then engaged the services of Mr. Hill, an experienced farmer who had suffered financial reverses and gone into bankruptcy. Mr. Hill successfully managed the farm for the Leunings during the crop year of 1961. Following negotiations between the parties, the Leunings agreed to lease their property to the Hills and, accordingly, a lease was executed on February 13, 1962. Insofar as the issues in this appeal be concerned, the pertinent portions of the lease are:

I.

. . .

9- This lease shall commence on the First day of January, 1962, and expire on the 31st day of December, 1962; however, Lessee is hereby granted an option to renew this lease for an additional term of six (6.) years, providing he gives written notice to the Lessor by the 30th day of November, of each year. *Lessee shall pay all spraying, fertilizing and labor costs, and any other and all costs in connection with the production and harvesting of the fruit crops grown on the herein described real estate.* [Italics ours.]

. . .

11- Lessor covenants and agrees to apply with the Lessee and sign with the Lessee all necessary applications to secure financing through the Production Credit Association. . . .

II.

It is expressly understood and agreed that the Lessor shall receive 25% of the gross receipts from the sale of all products grown on the above described premises and Lessee shall receive 75% of the gross receipts for all products raised on the above described premises. The term *gross receipts* shall mean the total of all funds received from the sale of all fruits and products and fruit products. Said settlement shall be made as the money is received and all checks in payment for said fruit products shall be made in the joint names of the Lessor and the Lessee herein and any financial institution where required.

Financing for appellants' farming operations under the lease was sought and obtained from the Central Washington Production Credit Association (hereafter referred to as PCA). Because of Mr. Hill's prior financial problems and relative insolvency, PCA required the Leunings to co-sign the notes Mr. Hill executed annually for crop loans, although the Leunings did not hold the type of PCA stock authorizing them to borrow from that agency. As provided in the lease, all payments received by Mr. Hill from the sale of fruit products were to be made in the joint names of Mr. Leuning, Mr. Hill, and PCA. When such payments

were made, Mr. Hill would ordinarily take them to Mr. Leuning, obtain his endorsement, and then deliver them to PCA, who would credit the payment to any loan balances remaining for the particular crop year involved.

On March 15, 1965, a note, payable upon demand or no later than June 5, 1966, was signed by Mr. Hill and the Leunings for $23,031 to obtain funds from PCA for the 1965-1966 crop year. In addition, and because of the amount of the loan commitment, which included a carryover from the preceding year, PCA requested the Leunings to give a mortgage upon their property as added security, which they agreed to do.

During the course of their annual dealings with PCA, Mr. Hill and Mr. Leuning each obtained credit life insurance policies upon their respective lives. Concerning the nature of their respective actions in this regard, the secretary-treasurer of PCA testified on direct examination as follows:

> A. Credit life insurance is voluntary. It's an added service to the members. They may take out credit life insurance in case they die to protect their widows and families. It is not mandatory.

The policies obtained were nonreducing term policies, in the form of certificates, issued by the Old Republic Life Insurance Co. under a group insurance arrangement with PCA, and were available solely to PCA borrowers. A physical examination was not required. The term of each policy was coextensive with the term of the loan pursuant to which it was written. When a loan was repaid or refinanced, the policies would terminate and new policies would be issued upon request for any subsequent indebtedness. The policies designated PCA as "the irrevocable first beneficiary" to the extent of its interest at the time of an insured's death with the balance, if any, payable to the estate of the insured. Because of the state of his health, Mr. Leuning was otherwise uninsurable.

When the note of March 15, 1965, was executed, Mr. Leuning applied for and obtained through PCA a term credit life

insurance policy in the face amount of $15,000, the maximum amount available to him in view of his age. The premium for the policy, as with former policies, was charged to the loan account.

On January 20, 1966, Mr. Leuning died. At the time of his death there was a balance of $10,097.04 remaining due on the outstanding indebtedness to PCA. Thereafter, the insurer, in response to a claim filed by PCA, remitted the unpaid balance on the loan to PCA, and paid the remaining sum due under the policy—$4,902.96—to respondent.

Contending that, as between the Leunings and the Hills, the Leunings were sureties and the Hills the principal obligors upon the PCA note, respondent by this suit sought to recover the amount paid by the insurer in discharging the indebtedness.

The trial court, in holding in favor of respondent, on this facet of the case, found and concluded that the Leunings were in fact sureties for the Hills and as such were entitled to reimbursement of the funds advanced through their collateral security—the credit life insurance policy.

Appellants do not seriously contest the trial court's determination regarding the status of the parties in relation to the PCA indebtedness. Nevertheless, it is pertinent to point out that while comakers to a written promissory obligation may sign and appear on the face of the writing as principals, they may in fact, as between themselves, occupy the relation of principal and surety, and, as between themselves, their true relationship may be established by parol or circumstantial evidence. It has, furthermore, been long recognized that when a surety, to protect his interests, discharges an obligation the primary responsibility for which rests with the principal obligor, an implied promise to indemnify or reimburse the surety comes into being on the part of the principal, which implied obligation, as such, is enforceable by the surety against the principal. *Austin v. Hamilton*, 7 Wash. 382, 34 P. 1097 (1893); *Handsaker v. Pedersen*, 71 Wash. 218, 128 P. 230 (1912); *Pease v. Syler*, 78 Wash. 24, 138 P. 310 (1914); *Holland v.*

*Tjosevig,* 109 Wash. 142, 186 P. 317 (1919); *Dittmar v. Frye & Co.,* 200 Wash. 467, 93 P.2d 717 (1939); *Eder v. Nelson,* 41 Wn.2d 58, 247 P.2d 230 (1952).

In this case there is substantial evidence to support the trial court's determination that the Leunings were sureties to the Hills on the PCA indebtedness.

Appellants in attacking the judgment, however, contend that respondent is not, under the circumstances of this case, entitled to indemnification or reimbursement because (a) the PCA indebtedness was not in default; (b) the debt was extinguished by the insurer and not by respondent; (c) the premium for the insurance policy was charged against the loan account, hence, was paid in part, if not in toto, by the Hills; (d) since the indebtedness was not in default prepayment was voluntary; (e) Mr. Leuning and Mr. Hill, in respectively obtaining credit life insurance policies, did not intend that respondent would be entitled to reimbursement of any payments made to PCA under Mr. Leuning's policy; and (f) respondent, if permitted to recover, would be unjustly enriched.

Appellants' contentions are comprehensive and engaging. Nevertheless, we cannot follow them through to the conclusion appellants would have us reach.

In essence, the question presented is whether payment of a debt with the proceeds of a credit life insurance policy, issued on the life and at the behest of a surety to the obligation, constitutes such a payment by the surety as would entitle the surety's estate to indemnification or reimbursement from the principal obligor. We believe the question deserves an affirmative answer in this case.

In addressing the problem, we note first that RCW 48.34 provides regulation for credit life insurance in this state. RCW 48.34.030(1) defines credit life insurance as:

(1) "Credit life insurance" means insurance on the *life of a debtor* pursuant to or in connection with a specific loan or other credit transaction;

(Italics ours.)

Under this definition it is apparent that it is the life of

the debtor which is insured, rather than the debt. *Betts v. Brown*, 219 Ga. 782, 136 S.E.2d 365 (1964).

Certainly an insured has an insurable interest in his own life, and so does a creditor of the insured to the extent of an indebtedness on a credit life insurance certificate or policy. A. Anderson, Couch on Insurance 2d § 24:115 (1960); J. Appleman, Insurance Law and Practice § 851 (1966). Likewise, a surety may have an insurable interest in the life of his principal, but it does not necessarily follow that a principal invariably has an insurable interest in the life of his surety. W. Vance on Insurance § 31, ch. 4, at 199 (B. Anderson 3d ed. 1951).

In the instant case, under the terms of their lease, the Hills were primarily responsible for the PCA indebtedness. Mr. Leuning, however, knew that as between him and PCA he stood in the shoes of a co-obligor upon the outstanding demand promissory note and that his property was mortgaged as further security for the obligation. He was also aware that he was in ill health and that the Hills, to a great extent, were dependent upon the uncertainties of farm income to retire the debt. Under these circumstances he applied for a credit life insurance policy to the full amount available to him, which the trial court found, upon credible evidence, to be a voluntary act upon his part and designed to protect the interests of his wife and his estate.

■ Under the terms of the insurance arrangement, PCA was the first and irrevocable beneficiary, to the extent of its interest, with Mr. Leuning's estate the secondary beneficiary. The fact that the premium was charged against the expense of the loan does not, in and of itself, detract from the fact that the policy was intended to provide collateral security for Mr. Leuning's promise to PCA and his obligation as a surety for the Hills. Furthermore, it is not clear in the record presented whether the expense of the premium for the particular policy in question was paid in full out of the farming receipts or prorated over the term of the loan and partially reimbursed from the policy proceeds.

When Mr. Leuning died, PCA filed its claim with the insurer for the balance due on the outstanding indebtedness, thus, in effect, calling the loan. The insurer, in keeping with its contractual obligations, paid off the loan and remitted the balance due on the policy to respondent. The events precipitating discharge of the indebtedness, therefore, do not lend themselves to characterizing the payment as a voluntary one on the part of respondent.

We conclude, as did the trial court, that, as between the Leunings and the Hills, it was not their intent that the Hills were to be relieved of their primary obligation on the indebtedness by the occurrence of Mr. Leuning's death. Discharge of the debt, then, out of proceeds from collateral security applied for and obtained by Mr. Leuning as a surety, entitled his estate to be reimbursed from the principal obligor.

This issue in the form presented is one of first impression in this state. Nevertheless, the issue under somewhat analogous circumstances has arisen in other jurisdictions and has been resolved in similar fashion.

In *Betts v. Brown, supra,* the plaintiff's deceased husband had conveyed mortgaged property to defendant Brown, who assumed the mortgage debt. Brown defaulted on the mortgage payments following which he and Mr. Betts executed a renewal note to the bank. At that time the bank procured credit life insurance upon the life of Betts for the amount of the debt. Brown later defaulted on the renewal note, and Betts died before the default was rectified. The insurer discharged the debt. The Georgia Supreme Court, under these circumstances, held that payment from the proceeds of the credit life insurance policy was an involuntary payment by the insured and that Betts' estate was entitled to reimbursement from the principal debtor, Brown.

In *Hatley v. Johnston,* 265 N.C. 73, 143 S.E.2d 260 (1965), plaintiff's deceased spouse had purchased a truck and executed a conditional sales contract to secure time payment. Included in the time price was an amount charged for

credit life insurance which the decedent had authorized the seller to purchase. Subsequently, the truck was transferred to the defendant, Johnston, who assumed payment of the balance due on the conditional sales contract, which was then in default. Before Johnston made up the default, Mr. Hatley died and the insurer discharged the indebtedness against the truck. The North Carolina Supreme Court held that payment by the insurer was tantamount to payment by the Hatleys as sureties and directed reimbursement by Johnston, as the principal obligor.

For similar results under similar circumstances see *Tighe v. Walton*, 233 Miss. 781, 103 So. 2d 8 (1958); *Kincaid v. Alderson*, 209 Tenn. 597, 354 S.W.2d 775 (1962); and *La-Rey, Inc. v. Kowalski*, 433 S.W.2d 530 (Texas 1968).

In the *Kincaid v. Alderson* case *supra*, the Tennessee court observed, at page 604:

> When thus a surety by his death through a valid life insurance policy on his life has discharged the obligation, this does not discharge the obligation of the Kincaids who are primarily liable. It would be exactly the same situation as if a surety on an obligation for any reason decided to pay off the obligation. This would not release the principal debtor from his obligation, but it would then be transferred to the surety who had discharged the obligation to release himself as surety. Thus by the death of Alderson and his life insurance paying this debt it would merely transfer the debt of the principal obligator to the surety rather than to the creditor. When the debt is thus paid the surety subrogated to the rights of the creditor. *Willis v. Davis*, 3 Minn. 1. This payment constitutes "an unjust enrichment of the principal" who must "reimburse the surety to the extent of the enrichment." Restatement of the Law, Security, sec. 104. Comment on Subsection (2), page 279.

In the instant case, to permit the Hills to avoid the primary obligation under their lease for the PCA indebtedness, at the expense of Mr. Leuning's death, would indirectly make them beneficiaries under Mr. Leuning's insurance policy in direct contravention of the provisions of the policy as well as the intent of the lease, all without the

consent of the insured or respondent. It would amount to an unjust enrichment of a principal obligor as against a surety, and properly entitle the surety to reimbursement.

The second issue in this appeal concerns itself with an award to respondent of the sum of $906.76 which the trial court found to be owing as rental under the terms of the lease. Appellants contend that the trial court erroneously included $230.97 in the award which should be credited to them as respondent's share of hauling charges incurred in transporting fruit products either about the farm premises or to market.

The lease provides, as heretofore noted, that the Hills, as lessees, were to pay "all costs" in the production and harvesting of the fruit crops grown on the premises. Hauling costs, while not specifically listed—as are spraying, fertilizing and labor costs—are not expressly excluded. Certainly, the hauling of farm produce is a sufficiently integral part of a fruit farming operation as to readily bring the costs thereof within the contemplation of the parties in negotiating a lease such as here involved.

We, as was the trial court, are satisfied that the phrase "all costs" includes the hauling costs appellants seek credit for. It was not error to deny appellants' claim.

The final issue relates to an effort on the part of appellants to refute the testimony of the secretary-treasurer of PCA concerning the voluntary nature of Mr. Leuning's acquisition of the credit insurance policy. Through the testimony of Mr. Hill, appellants endeavored to relate a contrary statement purportedly made by a PCA fieldman in 1962. The trial court sustained an objection to the proffered testimony on the grounds that it amounted to hearsay. Appellants contend the fieldman's statement was not offered to establish the truth thereof, but merely to show that such a statement was made.

We cannot agree with appellants. Obviously the testimony was offered to directly contradict evidence submitted by respondent, and the truth or falsity of the purported statement was essential to this end. Otherwise, the prof-

fered testimony would serve no material purpose. The trial court did not commit prejudicial error in excluding it.

The judgment is affirmed.

FINLEY, ROSELLINI, HUNTER, HALE, NEILL, and SHARP, JJ., and RYAN, J. Pro Tem., concur.