[No. 63429-7. En Banc.]

Argued June 11, 1996. Decided February 6, 1997.

YVONNE HONEY, ET AL., *Individually and as Trustees, Respondents*, v. ROBERT J. DAVIS, *Individually and as Partner, Petitioner.*

*Eisenhower & Carlson,* by *Ronald A. Roberts* and *P. Craig Beetham,* for petitioner.

*Velikanje, Moore & Shore, Inc., P.S.,* by *Patrick F. Hussey,* for respondents.

ALEXANDER, J. — We granted review of a decision of the Court of Appeals to the effect that lessors in a long-term ground lease who subordinated their interest in the leased land to a lending institution, in order to assist the lessee in securing financing for improvements to the leasehold, were sureties for the lessee. We reverse the Court of Appeals, concluding that the lessors, under the facts of this case, are not sureties.

Dr. Robert Davis and Earl McCarthy were partners doing business as Mid-Valley Mall Ltd. (Mid-Valley), a partnership that was formed for the purpose of developing a shopping mall. In 1979, Mid-Valley purchased land in Sunnyside, Washington and developed a shopping mall on it known as the Mid-Valley Mall.

In 1983, Mid-Valley decided to expand the mall. Toward that end, McCarthy began negotiating the purchase or lease of a 6.8 acre tract of land that was contiguous to the mall. The tract was owned by Sunnyside Theaters, Inc., a corporation, the stock of which was entirely owned by Lloyd and Yvonne Honey.

On February 23, 1984, with Yvonne Honey signing as president, Sunnyside Theaters, Inc. (hereinafter referred to as the Honeys)[1] entered into an agreement to lease the 6.8 acre tract to Mid-Valley for a period of 40 years. The

---

[1]Lloyd Honey died before the lease agreement was executed. Some time following his death, ownership of the 6.8 acre tract was transferred from Sunnyside Theaters, Inc. to Yvonne Honey and a trust established in Lloyd Honey's will. The plaintiffs in this suit are Yvonne Honey individually, and Steven Honey and Yvonne Sikes, the children of Lloyd and Yvonne Honey, in their capacity as trustees of the trust established by Lloyd Honey.

lease agreement provided that for the first seven months of the lease, during which it was contemplated that Mid-Valley would be constructing improvements on the leased tract, Mid-Valley was to pay the Honeys, as lessors, a lump sum lease payment of $29,317. According to the lease, after seven months Mid-Valley was to pay an annual rent of $50,256 in addition to 15 percent of any "excess rents" paid by sublessees. "Excess rents" were defined in the lease as those rents collected in excess of the sublessee's minimum annual rents. The lease provided further that in no event could the rent paid by Mid-Valley be less than 10 percent of the gross rent received by Mid-Valley from its sublessees. All of the improvements on the leased land, according to the terms of the lease, were to revert to the Honeys at the end of the 40-year term of the lease.

As part of the lease agreement, the Honeys agreed to subordinate their interest as lessors to the lien of any deed of trust that Mid-Valley would find it necessary to give to a lending institution in order to secure a loan of funds to cover the cost of constructing additions to the mall on the land covered by the lease. The lease did not indicate that the Honeys were sureties for Mid-Valley. It did, however, contain a statement that "[n]othing in this Lease shall be construed to render the Lessor in any way or for any purpose a partner, joint venturer or associate in any relationship with Lessee other than that of landlord and tenant." Clerk's Papers at 39.

In June 1985, Mid-Valley borrowed $3.18 million from Rainier Financial Services Company (Rainier) as financing for "Phase I" of the expansion of the mall onto land contiguous to the mall, including the leased property.[2] Mid-Valley signed a promissory note for that amount and gave Rainier a deed of trust. The Honeys did not sign the promissory note, but did sign the deed of trust. They also signed a "Rider To Deed Of Trust," in which they indicated that they executed the deed of trust

[2]Mid-Valley had previously borrowed $1.42 million from Rainier in order to finance construction of the mall on the land owned by Mid-Valley. "Phase I" was the designation given to the first expansion of the mall onto the land leased from the Honeys.

solely for the purpose of subjecting their interest in the Property described herein to the lien of this Deed of Trust and, except for subjecting their interest in said Property to the lien of this Deed of Trust, shall have no responsibility for payment of the Loan or performance of any of the obligations of the Borrower with respect to this Deed of Trust or any of the other Loan documents.

Clerk's Papers at 59.

The deed of trust was modified several times as Mid-Valley obtained additional funds from Rainier to cover the cost of expanding the mall onto the leased land. Finally, in May of 1989, Mid-Valley borrowed an additional $7 million from Rainier. That obligation was combined with all of Mid-Valley's prior obligations into a single promissory note for $11,600,000. Mid-Valley also provided Rainier with an amended deed of trust. The Honeys, again, did not sign the promissory note, but did join Mid-Valley in executing the amended deed of trust, pledging the entire mall, including the land leased from the Honeys, as security for the full debt.

Mid-Valley eventually defaulted on the promissory note. Consequently, Rainier began nonjudicial foreclosure proceedings in January 1992. It eventually purchased the entire mall, including the land that Mid-Valley leased from the Honeys, for $9 million at the foreclosure sale.

The Honeys subsequently brought suit in Spokane County Superior Court against Davis doing business as Mid-Valley Ltd.[3] for the fair market value of the land covered by the lease. They contended that by subordinating their interest in the leased land to Rainier's lien, they had become sureties for Mid-Valley and were, thus, entitled to reimbursement from Mid-Valley.

Mid-Valley, in addition to raising certain affirmative defenses, denied that a principal-surety relationship existed between itself and the Honeys. Both parties moved for summary judgment. The trial court granted Mid-Valley's

---

[3]McCarthy died prior to the signing of the lease.

motion, without reaching Mid-Valley's affirmative defenses, and dismissed the Honeys' action, stating that "the transactions and relation between the parties did not create a suretyship . . . between the Plaintiffs and the Defendants by operation of law." Clerk's Papers at 339. The Honeys appealed the superior court's decision to Division Three of the Court of Appeals. That court reversed the trial court, concluding that the Honeys were sureties as a matter of law. It also concluded that Mid-Valley's affirmative defenses were without merit and remanded the case to the superior court for a determination of the amount of damages sustained by the Honeys. We granted Mid-Valley's petition for review.

▨▨ When reviewing an order of summary judgment, an appellate court engages in the same inquiry as the trial court. *In re Estates of Hibbard*, 118 Wn.2d 737, 744, 826 P.2d 690 (1992). After considering the facts in the light most favorable to the nonmoving party, summary judgment should be granted only when there is no genuine issue of material fact, and the moving party is entitled to a judgment as a matter of law. *Hibbard*, 118 Wn.2d at 744. We are satisfied there is no material factual dispute here and the case is, therefore, ripe for summary judgment.[4]

The parties agree that the issue before us is whether, by subordinating their fee interest in the leased property to Rainier in order to enable Mid-Valley to secure financing for construction of additions to the mall on the leased land, the Honeys became sureties for Mid-Valley.

A general definition of a suretyship can be found in the restatement of security:

> Suretyship is the relation which exists where one person has undertaken an obligation and another person is also under an obligation or other duty to the obligee, who is

---

[4]The only factual dispute is whether the Honeys refused to help Davis save the mall from foreclosure. That dispute is immaterial to the issue of whether the Honeys stood as sureties for Davis.

entitled to but one performance, and as between the two who are bound, one rather than the other should perform.

RESTATEMENT OF THE LAW OF SECURITY § 82 (1941). Thus, in such a relationship both the surety and the principal are bound upon the obligation, with the principal having the primary obligation. If, however, the surety performs the obligation of the principal, or where the surety's property is used to satisfy the principal's duty, the principal is required to reimburse the surety. RESTATEMENT OF THE LAW OF SECURITY § 104; *Leuning v. Hill,* 79 Wn.2d 396, 400, 486 P.2d 87 (1971).

A written contract is not necessary to create a principal-surety relationship. Indeed, we have recognized that a person or entity can become a surety by pledging or mortgaging property as security for another's debt.[5] *Fluke Capital & Management Servs. Co. v. Richmond,* 106 Wn.2d 614, 620-21, 724 P.2d 356 (1986); LAURENCE P. SIMPSON, HANDBOOK ON THE LAW OF SURETYSHIP § 18, at 31 (1950) (One becomes a surety "where a person, without assuming any personal obligation, pledges or mortgages his property to secure another's debt."). In such cases, there is an implied promise by the principal to indemnify the surety notwithstanding the absence of an express written agreement. *Fluke Capital & Management Servs. Co.,* 106 Wn.2d at 620.

■ "The principal and not the surety, however, is the one to whom or for whom the consideration for the main obligation flows, and this is one basis on which the two parties may be distinguished." ARTHUR ADELBERT STEARNS, THE LAW OF SURETYSHIP § 1.4, at 3 (James L. Elder ed., 5th ed. 1951). Therefore, "one who receives and retains the consideration or benefit of a contract cannot occupy the position of a surety." 74 AM. JUR. 2D *Suretyship* § 3, at 13

---

[5]Where a person agrees to be answerable for the debt of another, a "personal" suretyship is created. Where property is pledged for the debt of another, a "real" surety is created and liability is limited to the value of the property pledged. ARTHUR ADELBERT STEARNS, THE LAW OF SURETYSHIP § 1.3, at 2-3 (James L. Elder ed., 5th ed. 1951).

(1974); *Johnson v. Jouchert,* 124 Ind. 105, 108, 24 N.E. 580 (1890) ("One who has received, and who retains, the consideration or benefit of a contract can not, in equity, occupy the attitude of a surety."). We are inclined to follow these authorities, and thus conclude that evidence of consideration for an obligation flowing to both obligors belies a contention that either is a surety.

Whether lessors become a surety for the lessee by subordinating their reversionary interest in the leased property to a lender is an issue of first impression in Washington. Other jurisdictions have concluded that a suretyship is not created in similar circumstances. In *Matthews v. Hinton,* 234 Cal. App. 2d 736, 44 Cal. Rptr. 692 (1965), for example, the California Court of Appeal concluded, on similar facts, that lessors did not stand as a surety in relation to a creditor of the lessee. In that case, two landowners leased an unimproved tract of land to a lessee, who in turn sublet the land to two other persons. The sublessees then borrowed money from a lending institution to finance construction on the leased land. As in the instant case, the lessors did not sign the promissory note that was given to the lender. They did, however, subordinate their reversionary interest in the land to the lender by signing the deed of trust. When the sublessees eventually defaulted on the obligation, the lender commenced sale proceedings. In response, the sublessees filed suit against the lender and lessors, seeking to enjoin the impending trustee's sale. The sale went forward, however, and the lessors eventually regained possession of the property, either at the sale or shortly thereafter. The lessors then filed a cross-claim against the lender and trustholder, claiming that the property was wrongfully sold at the trustee's sale and seeking a judgment for the fair market value of the land. The lessors alleged that, because the deed of trust was signed by them as sureties only, the lender should have looked to the sublessee's other assets before forcing a sale of the land that secured the debt. The lender moved for summary judgment, alleging that there was no agreement between the parties establishing a

principal-surety relationship. In ruling against the lessors, the court held that the lessors were principals and not sureties. In doing so, it emphasized the fact that consideration for the main obligation flowed to the lessors, stating:

> The role in which appellants contracted is depicted on the face of the papers. Appellants were the owners of unimproved land. They leased it to a developer for 65 years for ground rentals aggregating $309,000. As lessors they had a direct financial interest in the construction of improvements which would produce income and ground rent.

*Matthews,* 44 Cal. Rptr. at 696. Relying on *Matthews,* courts in at least two other jurisdictions have reached the same result. *See State of Wis. Inv. Bd. v. Hurst,* 410 N.W.2d 560 (S.D. 1987); *Guaranty Mortgage Co. v. Ryan Supply Co.,* 363 So. 2d 739 (Miss. 1978).

The Court of Appeals acknowledged *Matthews* and the above cited cases that relied on it, but distinguished them by pointing out that in each of those cases the lessor was asserting suretyship as a defense against a creditor, whereas here, the party claiming to be a surety is bringing suit against a principal for reimbursement. Ultimately, it concluded that Mid-Valley was the principal obligor and, as such, should have performed the obligation, and that the Honeys were a surety in relation to Mid-Valley, and thus entitled to reimbursement from Mid-Valley. *Honey v. Davis,* 78 Wn. App. 279, 896 P.2d 1303 (1995), *review granted,* 128 Wn.2d 1016 (1996). In reaching this conclusion, the Court of Appeals stressed its view that direct benefit for the main obligation flowed only to Mid-Valley and not the Honeys, emphasizing that none of the proceeds of the loan were paid to the Honeys and that the promissory note underlying the obligation was signed only by Mid-Valley.

We disagree with the Court of Appeals that the reasoning of *Matthews* and the cases that have followed it is not persuasive. In saying that, we are not unmindful that those cases dealt only with the question of whether a subordinating lessor is a principal in relation to its les-

see's creditor. We recognize also that an obligor's surety-ship status in relation to a creditor is not necessarily dis-positive of its status in relation to a co-obligor.[6] Never-theless, we can conceive of no basis for holding that these lessors, who subordinated their reversionary fee interest to their lessee's creditor in anticipation of substantial gain to themselves, stand as a surety in relation to the lessee.

■■ We are thus inclined to follow the *Matthews* rea-soning and conclude that no principal-surety relationship was established between the Honeys and Mid-Valley. We do so because the same factors are present here that led the *Matthews* court to conclude that lessors who subordi-nated their interest in a leasehold to a lender were not a surety in relation to the lessee's creditor. Importantly, sig-nificant benefits were to flow to the Honeys as a result of the Honeys' subordination of their interest in the leased land to the lender. While it may be true that the Honeys acted, at least in part, simply to accommodate Mid-Valley in its effort to secure financing, it is apparent from the lease agreement that it was in their best financial interest to do so. Specifically, they anticipated benefits in the form of improvements to the leased land in which they held the fee interest, land which would revert to them at the conclusion of the lease. Furthermore, according to the terms of the lease, their income from rent would increase, as would the value of the land, as buildings were con-structed on the leased land as a direct consequence of the loan. It, therefore, cannot be said that the Honeys pledged their land only to secure the debt of Davis and Mid-Valley. The Honeys' subordination of their interest in the leasehold was clearly made to induce Rainier to finance capital construction on the leased land, which in the short and long run brought direct benefits to the Honeys.

A suretyship obligation "never arises by act of the par-

---

[6]*See, e.g., Hemenway v. Miller,* 116 Wn.2d 725, 728-29, 807 P.2d 863 (1991) (maker of note who is surety in relation to assignee not necessarily surety in re-lation to creditor); Restatement of the Law of Security § 82, at 232-33 (credi-tor under some circumstances not affected by surety relation between original mortgagor and assignee of liability).

ties except by express contract or by operation of law." 74 Am. Jur. 2d *Suretyship* § 7, at 16 (1974) (footnote omitted). As there was no express agreement between Mid-Valley and the Honeys, we are left to determine whether a suretyship arose by operation of law. The dissent summarily concludes that "[t]he Honeys became sureties by pledging their property as security for Mid-Valley's debt." Dissenting op. at 226. Similarly, the concurrence determines that "[t]he Honeys paid Mid-Valley's debt to the lender; they were plainly a surety." Concurring op. at 223. We disagree. The relation of suretyship by operation of law "is fixed by the arrangement and *equities* between the parties[.]" 74 Am. Jur. 2d *Suretyship* § 8, at 17 (emphasis added). In our judgment, the facts do not favor a conclusion that it is equitable to recognize a suretyship here. The plain fact is that the Honeys could reasonably have anticipated receiving substantial benefits from Rainier's loan to Mid-Valley. The pledge of their property, therefore, cannot be said to be for the benefit of another. Rather, it was in part for themselves.

In sum, we are satisfied that under these facts and the equities that existed between the parties, a suretyship did not arise between the Honeys and Mid-Valley. There was no written agreement establishing a principal-surety relationship and a review of the lease and the undisputed facts makes it clear that none was intended or contemplated by the parties. Because we hold that no such relationship existed between the parties, we need not address the affirmative defenses raised by Mid-Valley.

The decision of the Court of Appeals is reversed and the Spokane County Superior Court's order of summary judgment in favor of Davis doing business as Mid-Valley Mall Ltd. is reinstated.

Reversed.

DOLLIVER, SMITH, GUY, and MADSEN, JJ., concur.

TALMADGE, J. (concurring) — I concur in the result the

majority reaches, but I reach that result by an entirely different approach.

Subrogation in suretyship is of ancient lineage. Its roots extend to Roman law. Saul Litvinoff, *Subrogation*, 50 LA. L. REV. 1143, 1149 (1990); *Allied Fidelity Ins. Co. v. Environmental Quality Council*, 753 P.2d 1038, 1041 (Wyo. 1988). "It came to us through the civil law, and it was from the civil law that the courts of chancery derived both the term and doctrine." 73 AM. JUR. 2D *Subrogation* § 5, at 602 (1974). Justice Black stated the principle in *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136-37, 83 S. Ct. 232, 9 L. Ed. 2d 190 (1962):

> Traditionally sureties compelled to pay debts for their principal have been deemed entitled to reimbursement, even without a contractual promise. . . . And probably there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed.

I disagree with the majority that the Honeys' relationship with the lender controls whether the Honeys had a surety relationship with Mid-Valley. The Honeys paid Mid-Valley's debt to the lender; they were plainly a surety. *Matthews v. Hinton*, 234 Cal. App. 2d 736, 44 Cal. Rptr. 692 (1965), the case the majority opinion relies upon, is inapposite because the issue in that case was whether Matthews could claim surety defenses *with respect to the creditor*. The court correctly said no, but did not address the question of whether Matthews was a surety *with respect to the principal*. The question in this case is precisely that, i.e., whether the Honeys were a surety with respect to Mid-Valley, the principal. *Matthews* does not provide an answer to that question. Here, the Honeys were a surety with respect to Mid-Valley insofar as they paid Mid-Valley's debt to the lender.

The mere existence of a suretyship does not establish the right to subrogation, however. "Subrogation in all its phases appeals to the conscience of the court, and the

court is clothed with wide discretion in its application."
ARTHUR ADELBERT STEARNS, THE LAW OF SURETYSHIP
§ 11.1, at 441 (James L. Elder ed., 5th ed. 1951).

> Subrogation has been characterized as an eminently just
> doctrine, a pure unmixed equity, one of the benevolences of
> the law, created, fostered, and enforced in the interest and
> for the promotion of equity and justice, and to prevent
> injustice. Being founded on principles of natural reason and
> justice, it is a highly favored doctrine, which is to be given a
> liberal application, and which the courts are inclined to
> extend rather than to restrict. Perhaps no doctrine of equity
> jurisprudence is more beneficent in its operation, and perhaps
> none stands in higher favor.

73 AM. JUR. 2D *Subrogation* § 7, at 603 (1974) (citations
omitted). Subrogation "is not a matter of strict right, but
is purely equitable in its nature, dependent upon the facts
and circumstances of each particular case, and that it will
not be enforced when it would be inequitable." *Gray v. Ja-
cobsen*, 13 F.2d 959, 960, 48 A.L.R. 583 (D.C. Cir. 1926).
"The doctrine of subrogation is a device to promote
justice." *Acer v. Hotchkiss*, 97 N.Y. 395, 402 (1884). Thus,
as the courts of equity of old, we must look to the result
that will promote the most justice in this case.

The Honeys put at risk property worth $9 million
without setting forth in writing the rights and duties of
the parties stemming from the subordination of the
Honeys' interest in the property. Had Mid-Valley com-
pleted the project as planned, the Honeys stood to gain
the value of the capital improvements to their property,
as well as increased rent. There is no intimation of op-
pression, duress, or incompetence in the negotiation of the
agreement between the Honeys and Mid-Valley. There is
no intimation of unequal bargaining power. Indeed, as the
owner of the property, the Honeys appear to have been in
a superior bargaining position.

A compensated surety, like a bonding company, typi-
cally requires the principal to pledge assets the surety can
go against if the surety must pay the principal's debt. The

Honeys did not obtain such a pledge from Mid-Valley or the Mid-Valley principals. Thus, from all appearances, the Honeys took a business risk in the hope of a financial reward stemming from the increased value of their property. They took no steps to insure themselves against the risk of loss. Unfortunately for them, the failure of Mid-Valley dashed their expectations.

The Honeys now ask us to rectify that failure. They want the courts to make a contract they failed to make, allowing them to obtain reimbursement for their loss from Mid-Valley. I see no justice in such a result. The Honeys freely took a business risk and lamentably suffered a loss. They did not contract to indemnify themselves against that loss. It is not for the courts to write contracts for those who do not write them for themselves. No equities support the Honeys' claim.

In summary, I disagree with the majority's failure to find a suretyship here. Even though the Honeys were a surety, however, the equities do not support the application of subrogation. I therefore concur in the majority's disposition of the case.

SANDERS, J. (dissenting) — Of course I dissent for self-evident reasons. Lessors who subordinate their reversionary fee interest may stand as principals to the creditor and sureties to the lessee. As such they are entitled to reimbursement from the lessee after they have discharged an obligation for which the lessee was the principal obligor. This is the necessary result in law and equity.

When Mid-Valley and the Honeys signed their original lease in February 1984 they agreed their legal relationship would be that of landlord-tenant. However, the rider to the subsequent June 1985 deed of trust did not limit the relationship between the two. When they signed the rider the parties had neither discussed nor entered into any agreements or understandings regarding the consequences of a future default to the creditor nor had they specified the Honeys' rights and remedies if their interest

in their property were foreclosed. Absent an agreed delineation of the rights and remedies of these parties in case of default, normal rules of suretyship apply. The Honeys became sureties by pledging their property as security for Mid-Valley's debt without assuming a personal obligation. *See Fluke Capital & Management Servs. Co. v. Richmond,* 106 Wn.2d 614, 620-21, 724 P.2d 356 (1986). As such they were entitled to indemnification by the principal, Mid-Valley. "A[ ] . . . surety who is required to pay the obligation of his principal (the accommodated party) may recover the amount paid with interest. The action is not upon the note, but is an obligation or promise implied by law." *Eder v. Nelson,* 41 Wn.2d 58, 62, 247 P.2d 230 (1952) (citations omitted).

It has long been recognized in this State that "while co-makers to a written promissory obligation may sign and appear on the face of the writing as principals, they may in fact, as between themselves, occupy the relation of principal and surety, and, as between themselves, their true relationship may be established by parol or circumstantial evidence." *Leuning v. Hill,* 79 Wn.2d 396, 400, 486 P.2d 87 (1971). This premise holds true because " '[i]t is immaterial in what form the relation of principal and surety is established, or whether the creditor was or was not contracted with in that relation. The relation is vested by the arrangement and equities between the debtors, and may or may not be known to the creditor.' "*State of Wis. Inv. Bd. v. Hurst,* 410 N.W.2d 560, 563 (S.D. 1987) (quoting *Heinrich v. Magee,* 52 S.D. 371, 217 N.W. 631, 634 (1928)).

It is also true that "[o]ne who signs a security document or other contract as a principal will be held as such even though the creditor knows that as between the signer and his fellow obligor, the former is only a surety," *Matthews v. Hinton,* 234 Cal. App. 2d 736, 44 Cal. Rptr. 692, 696 (1965); however, this rule does not alter the principal' and the surety's relationship but merely estops a surety who signs a security document as a principal from denying his

status as a principal *to the creditor.* "Whether one is a surety depends not so much upon his relation with the creditor as upon his relation to the principal debtor. *In such a tripartite relationship one of the obligors may be a surety in the sense that, if he is called upon to pay the debt, he may indemnify himself by an action against the primary obligor; nevertheless, so far as the creditor is concerned, he contracts for a primary liability."* *Id.* at 695-96 (emphasis added) (citations omitted). The Court of Appeals therefore correctly concluded the Honeys are not estopped from relying on their status as sureties by the form of their signature on the deed of trust as *against the principal.*[7]

The majority asserts lessors cannot be sureties when they subordinate their interest for financial gain. The flaw in this reasoning is the conclusion that because consideration flowed to the Honeys, the Honeys were a principal and not a surety. However, the majority mistakenly equates the benefit the Honeys would have received from the completion of the project with the consideration for the main obligation, i.e., the loan proceeds, flowing from the lender to the principal. The Honeys did not receive any of the loan proceeds. "The principal and not the surety, however, is the one to whom or for whom the consideration for the *main obligation* flows." ARTHUR ADELBERT STEARNS, THE LAW OF SURETYSHIP § 1.4, at 3 (James L. Elder ed., 5th ed. 1951) (emphasis added). This court has recognized that a surety may indirectly benefit from the relationship without destroying his role as a surety:

---

[7]None of the courts in other jurisdictions have foreclosed the existence of a surety relationship when lessors subordinate their reversionary interest *even in relation to the creditor.*

Owners argue that holding them to be principals would render that portion of SDCL 56-2-1, which provides that a suretyship arises when one 'hypothecates property' to secure the debt of another, a nullity. To the contrary, we are not holding that when one hypothecates property to secure the debt of another that he is *automatically* a principal. We merely hold such a relationship arose *under the facts of this case* . . . . Owners could attempt to establish that they were in fact sureties, even though the mortgage was arguably signed as principals.

*Hurst,* 410 N.W.2d at 564.

> It has . . . been long recognized that when a surety, *to protect his interests,* discharges an obligation the primary responsibility for which rests with the principal obligor, an implied promise to indemnify or reimburse the surety comes into being on the part of the principal, which implied obligation, as such, is enforceable by the surety against the principal.

*Leuning,* 79 Wn.2d at 400 (emphasis added). Here the main consideration, the Rainier Financial Services Company loan, flowed to Mid-Valley Mall Ltd. Partnership, while the Honeys merely benefited secondarily from the subordination. Mid-Valley Mall is therefore the principal obligor and the Honeys are entitled to be indemnified or reimbursed by it.

Finally, while the majority errs by failing to recognize that a surety relationship could and does exist between the Honeys and Mid-Valley, the concurrence acknowledges this relationship but would deny the Honeys' right to indemnification because "the equities" do not support it. Concurrence at 225. The concurrence cites not a scintilla of precedent to support this claim. It uses the term "equity" as if such is a ticket to anywhere the jurist might like to go. The concurrence ignores the fact that the law of suretyship *is* equitable by its nature; whereas, the nonexistence of a contractual clause assigning risk is the very reason the court assigns the risk as per the suretyship rule:

> *Irrespective of the existence of an express contract of indemnity it is an established rule of law, based on equitable considerations,* that where one person is in the situation of a mere surety for another, whether he became so by actual contract or by operation of law, and pays or is compelled to pay the debt which the other in equity and justice ought to have paid, or extinguishes it so that it is no longer a debt against the other, he is entitled to relief against the other, who was in fact the principal debtor; that is, the law in such cases implies a promise on the part of the principal to reimburse the surety for the amount paid.

74 AM. JUR. 2D *Suretyship* § 171, at 120 (1974) (emphasis added) (footnotes omitted). This rule *is* equitable assurance to the surety, who has paid the debt of another, that he will be indemnified. *See State Fidelity Mortgage Co. v. Varner*, 740 S.W.2d 477, 480 (Tex. Ct. App. 1987) ("[A] surety who has paid the debt of her principal is subrogated to a right of action against the principal for the debt so paid."); *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136-37, 83 S. Ct. 232, 9 L. Ed. 2d 190 (1962) ("Traditionally sureties compelled to pay debts for their principal have been deemed entitled to reimbursement, even without a contractual promise . . . ."), *superseded by statute as stated in In re Nemko, Inc.*, 143 B.R. 980 (Bankr. E.D.N.Y. 1992).

The Honeys, as sureties, are entitled as a matter of law to reimbursement precisely *because* they did not specifically assign the risk of loss in the contract. "[C]ontracting parties are generally deemed to have relied on existing state law pertaining to interpretation and enforcement." *Margola Assocs. v. City of Seattle*, 121 Wn.2d 625, 653, 854 P.2d 23 (1993). A surety who pays the obligation of the principal is entitled to indemnification. *Eder*, 41 Wn.2d at 62. The right to indemnification arises not out of the language of the contract, but is implied by law. *Id.* The Honeys were not required to further assign the risk of contract breach because the common law of surety, derived from equitable considerations, already provides that they are entitled to reimbursement from the principal, Mid-Valley. A court does not write a new contract for the parties when it recognizes a surety's common-law right of indemnification; it merely construes the existing one according to established criteria.

The decision of the Court of Appeals should be affirmed and the case should be remanded to the superior court. I dissent.

230

DURHAM, C.J., and JOHNSON, J., concur with SANDERS, J.

Reconsideration denied May 20, 1997.

[No. 63839-0.   En Banc.]
Argued October 8, 1996.   Decided February 6, 1997.
THE STATE OF WASHINGTON, *Respondent*, v. PAUL CURTIS BLANK, *Petitioner*.